## NATIONAL LABOR RELATIONS BOARD *v.* GREAT DANE TRAILERS, INC.

No. 781.   Argued April 19, 1967.—Decided June 12, 1967.

*Arnold Ordman* argued the cause for petitioner. With him on the brief were *Solicitor General Marshall, Dominick L. Manoli* and *Norton J. Come.*

*O. R. T. Bowden* argued the cause and filed a brief for respondent.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The issue here is whether, in the absence of proof of an antiunion motivation, an employer may be held to have violated §§ 8 (a)(3) and (1) of the National Labor Relations Act [1] when it refused to pay striking employees vacation benefits accrued under a terminated collective bargaining agreement while it announced an intention to pay such benefits to striker replacements, returning strikers, and nonstrikers who had been at work on a certain date during the strike.

---

[1] National Labor Relations Act, as amended, §§ 8 (a)(3) and (1), 61 Stat. 140–141, 29 U. S. C. §§ 158 (a)(3) and (1).

The respondent company and the union [2] entered into a collective bargaining agreement which was effective by its terms until March 31, 1963. The agreement contained a commitment by the company to pay vacation benefits to employees who met certain enumerated qualifications.[3] In essence, the company agreed to pay specified vacation

---

[2] Local 26, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO.

[3] Article VIII of the collective bargaining agreement was entitled "Vacations." It read, in pertinent part:

"(a) Each qualified employee covered by this agreement shall be entitled after one (1) year of continuous employment, at a time agreeable to the Company, to a vacation of seven (7) consecutive days with pay for forty (40) hours at the rate of pay existing for such employee at the time of the beginning of his vacation. Each employee, after five (5) years' continuous service, shall be entitled to a vacation of fourteen (14) consecutive days, with pay for eighty (80) hours. Any employee entitled to a vacation with pay may waive the right, if his services are needed by the employer, to such vacation during the period of this agreement, and in such cases shall be entitled to receive in lieu thereof, at the time he becomes entitled to the vacation, the amount of vacation pay such employee would otherwise have received over and above the wages received for work performed during the vacation period.

"(b) To qualify for the said vacation, it is necessary that an employee shall have worked a total of fifteen hundred twenty-five (1525) hours in the said year; any time lost, however, because of an industrial accident while employed by this Company to count as part of the qualifying time.

.          .          .          .          .

"(d) Employees who have served less than sixty (60) days on the next July 1 after date of employment will receive no vacation pay on that date but on the following July 1 will receive the vacation due in accordance with the above qualifying requirements, plus extra amount due in accordance with hours worked.

"(e) In case of lay-off, termination or quitting, an employee who has served more than sixty (60) days shall receive pro rata share of vacation.

"(f) All vacation pay shall be paid on Friday nearest July 1st, except as outlined in paragraph (d)."

benefits to employees who, during the preceding year, had worked at least 1,525 hours. It was also provided that, in the case of a "lay-off, termination or quitting," employees who had served more than 60 days during the year would be entitled to pro rata shares of their vacation benefits. Benefits were to be paid on the Friday nearest July 1 of each year.

The agreement was temporarily extended beyond its termination date, but on April 30, 1963, the union gave the required 15 days' notice of intention to strike over issues which remained unsettled at the bargaining table. Accordingly, on May 16, 1963, approximately 350 of the company's 400 employees commenced a strike which lasted until December 26, 1963. The company continued to operate during the strike, using nonstrikers, persons hired as replacements for strikers, and some original strikers who had later abandoned the strike and returned to work.[4] On July 12, 1963, a number of the strikers demanded their accrued vacation pay from the company. The company rejected this demand, basing its response on the assertion that all contractual obligations had been terminated by the strike and, therefore, none of the company's employees had a right to vacation pay. Shortly thereafter, however, the company announced that it would grant vacation pay—in the amounts and subject to the conditions set out in the expired agreement— to all employees who had reported for work on July 1, 1963. The company denied that these payments were founded on the agreement and stated that they merely reflected a new "policy" which had been unilaterally adopted.

---

[4] All strikers had been replaced by October 8, 1963. After their replacement, some strikers were rehired by the company, apparently as new employees.

The refusal to pay vacation benefits to strikers, coupled with the payments to nonstrikers, formed the bases of an unfair labor practice complaint filed with the Board while the strike was still in progress. Violations of §§ 8 (a)(3) and (1) were charged. A hearing was held before a trial examiner who found that the company's action in regard to vacation pay constituted a discrimination in terms and conditions of employment which would discourage union membership, as well as an unlawful interference with protected activity. He held that the company had violated §§ 8 (a)(3) and (1) and recommended that it be ordered to cease and desist from its unfair labor practice and to pay the accrued vacation benefits to strikers. The Board, after reviewing the record, adopted the Trial Examiner's conclusions and remedy.[5]

A petition for enforcement of the order was filed in the Court of Appeals for the Fifth Circuit. That court first dealt with the company's contention that the Board had lacked jurisdiction and that the union should have been relegated either to the bargaining table or to a lawsuit under § 301 of the Act,[6] since the basic question was one of contract interpretation and application. It noted that the company's announced policy relating to vacation pay clearly concerned a "term or condition of employment"; since it was alleged that the company had discriminated between striking and nonstriking employees in regard to that term or condition of employment, the complaint stated "an unfair labor practice charge in simplest terms" and the Board had properly exercised its jurisdiction.[7]

---

[5] The complaint also charged independent violations of § 8 (a)(1). These were rejected by the Trial Examiner and by the Board.

[6] § 301, Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185.

[7] In this Court the company apparently abandoned the argument under § 301. In any event, we agree with the Court of Appeals

Reviewing the substantive aspects of the Board's decision next, the Court of Appeals held that, although discrimination between striking and nonstriking employees had been proved, the Board's conclusion that the company had committed an unfair labor practice was not well-founded inasmuch as there had been no affirmative showing of an unlawful motivation to discourage union membership or to interfere with the exercise of protected rights. Despite the fact that the company itself had not introduced evidence of a legitimate business purpose underlying its discriminatory action, the Court of Appeals speculated that it might have been motivated by a desire "(1) to reduce expenses; (2) to encourage longer tenure among present employees; or (3) to discourage early leaves immediately before vacation periods." Believing that the possibility of the existence of such motives was sufficient to overcome the inference of an improper motive which flowed from the conduct itself, the court denied enforcement of the order. 363 F. 2d 130 (1966). We granted certiorari to determine whether the treatment of the motivation issue by the Court of Appeals was consistent with recent decisions of this Court. 385 U. S. 1000 (1967).

---

that the complaint, alleging as it did a discrimination in regard to a term or condition of employment, stated an unfair labor practice charge. The fact that the conduct complained of might also have supported an action under § 301 did not deprive the Board of jurisdiction. *NLRB* v. *C & C Plywood Corp.*, 385 U. S. 421 (1967); *Mastro Plastics Corp.* v. *Labor Board*, 350 U. S. 270 (1956). Cf. *Smith* v. *Evening News Assn.*, 371 U. S. 195 (1962). This, of course, is not to say that every breach of a collective bargaining agreement may be the subject of an unfair labor practice proceeding. But when the elements of an unfair labor practice are present in a breach of contract, the injured party is not automatically deprived by § 301 of his right to proceed before the Board where his remedy may be speedier and less expensive than a lawsuit. *NLRB* v. *C & C Plywood Corp.*, *supra*, at 429–430.

The unfair labor practice charged here is grounded primarily in § 8 (a)(3) which requires specifically that the Board find a discrimination and a resulting discouragement of union membership. *American Ship Building Co.* v. *Labor Board,* 380 U. S. 300, 311 (1965). There is little question but that the result of the company's refusal to pay vacation benefits to strikers was discrimination in its simplest form. Compare *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793 (1945), with *Teamsters Union* v. *Labor Board,* 365 U. S. 667 (1961). Some employees who met the conditions specified in the expired collective bargaining agreement were paid accrued vacation benefits in the amounts set forth in that agreement, while other employees [8] who also met the conditions but who had engaged in protected concerted activity were denied such benefits. Similarly, there can be no doubt but that the discrimination was capable of discouraging membership in a labor organization within the meaning of the statute. Discouraging membership in a labor organization "includes discouraging participation in concerted activities . . . such as a legitimate strike." *Labor Board* v. *Erie Resistor Corp.,* 373 U. S. 221, 233 (1963). The act of paying accrued benefits to one group of employees while announcing the extinction of the same benefits for another group of employees who are distinguishable only by their participation in protected concerted activity surely may have a discouraging effect on either present or future concerted activity.

---

[8] National Labor Relations Act, as amended, § 2 (3), 61 Stat. 137, 29 U. S. C. § 152 (3), declares:

"The term 'employee'. . . shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute . . . and who has not obtained any other regular and substantially equivalent employment . . . ."

But inquiry under § 8 (a) (3) does not usually stop at this point. The statutory language "discrimination . . . to . . . discourage" means that the finding of a violation normally turns on whether the discriminatory conduct was motivated by an antiunion purpose. *American Ship Building Co.* v. *Labor Board,* 380 U. S. 300 (1965). It was upon the motivation element that the Court of Appeals based its decision not to grant enforcement, and it is to that element which we now turn. In three recent opinions we considered employer motivation in the context of asserted § 8 (a) (3) violations. *American Ship Building Co.* v. *Labor Board, supra; Labor Board* v. *Brown,* 380 U. S. 278 (1965); and *Labor Board* v. *Erie Resistor Corp., supra.* We noted in *Erie Resistor, supra,* at 227, that proof of an antiunion motivation may make unlawful certain employer conduct which would in other circumstances be lawful. Some conduct, however, is so "inherently destructive of employee interests" that it may be deemed proscribed without need for proof of an underlying improper motive. *Labor Board* v. *Brown, supra,* at 287; *American Ship Building Co.* v. *Labor Board, supra,* at 311. That is, some conduct carries with it "unavoidable consequences which the employer not only foresaw but which he must have intended" and thus bears "its own indicia of intent." *Labor Board* v. *Erie Resistor Corp., supra,* at 228, 231. If the conduct in question falls within this "inherently destructive" category, the employer has the burden of explaining away, justifying or characterizing "his actions as something different than they appear on their face," and if he fails, "an unfair labor practice charge is made out." *Id.,* at 228. And even if the employer does come forward with counter explanations for his conduct in this situation, the Board may nevertheless draw an inference of improper motive from the conduct itself and exercise its duty to strike the proper balance between the asserted

business justifications and the invasion of employee rights in light of the Act and its policy. *Id.,* at 229. On the other hand, when "the resulting harm to employee rights is . . . comparatively slight, and a substantial and legitimate business end is served, the employers' conduct is prima facie lawful," and an affirmative showing of improper motivation must be made. *Labor Board* v. *Brown, supra,* at 289; *American Ship Building Co.* v. *Labor Board, supra,* at 311–313.

From this review of our recent decisions, several principles of controlling importance here can be distilled. First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

Applying the principles to this case then, it is not necessary for us to decide the degree to which the challenged conduct might have affected employee rights. As the Court of Appeals correctly noted, the company came forward with no evidence of legitimate motives for its discriminatory conduct. 363 F. 2d, at 134. The company simply did not meet the burden of proof, and

the Court of Appeals misconstrued the function of judicial review when it proceeded nonetheless to speculate upon what *might have* motivated the company. Since discriminatory conduct carrying a potential for adverse effect upon employee rights was proved and no evidence of a proper motivation appeared in the record, the Board's conclusions were supported by substantial evidence, *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474 (1951), and should have been sustained.

The judgment of the Court of Appeals is reversed and the case is remanded with directions to enforce the Board's order.

*It is so ordered.*

Mr. Justice Harlan, whom Mr. Justice Stewart joins, dissenting.

Because I think that the Court puts forth a premise which misinterprets the recent decision in *NLRB* v. *C & C Plywood Corp.,* 385 U. S. 421, and has proposed a determining rule based on a distillation of prior opinions which is, in my view, substantially inaccurate, I am constrained to express my dissent from its opinion. I believe that the Fifth Circuit correctly analyzed the problem, and that its decision should be affirmed.

The Court begins by stating that vacation benefits had "accrued" under the contract, and implies that striking employees had a contractual right to such benefits which was arbitrarily disregarded by Great Dane in order to punish those employees for engaging in protected activity. Were these the properly established facts of the case, I would have little difficulty in concurring in the result reached by the majority. Employer action which undercuts rights protected by § 7 of the National Labor Relations Act, as amended, 61 Stat. 140, and has no inferable, legitimate business purpose has been held a violation of §§ 8 (a)(3) and (1). *Republic Aviation*

*Corp.* v. *Labor Board,* 324 U. S. 793. But the contract dispute is not so frivolous as to be determined without examination,[1] and the issue framed by the Court is not properly before us. Moreover, contrary to the Court's assertion, neither the Board nor the lower court limited itself to considering this issue, and both recognized a limitation on the Board's contract interpretation powers in light of § 301 (a) of the Labor Management Relations Act, 1947.[2]

The Board disclaimed "interpreting the contract for the parties" and held only that "strikers must be treated uniformly with nonstrikers with respect to whatever benefits accrue to the latter from the existence of the employment relationship." It explained that its order would merely force the employer to use the same vacation pay criteria for all employees and only prevent Great Dane from using the requirement that a recipient be at work as of July 1, 1963. The Court of Appeals considered the "term or condition of employment" at issue to be the employer's unilaterally declared vacation "policy." It explicitly disregarded "the question of whether the Board *would* have acted improperly . . . to decide whether it was an unfair labor practice to withhold benefits due *under the contract* . . . ." 363 F. 2d 130, 133. (Emphasis in original.)

---

[1] The union elected to terminate the contract raising the question whether any right to vacation pay survived the termination. Also the contract provided for vacation pay when the employee was not actually granted a vacation, and the initial choice lay with the employer. Thus under the contract the employer was not obligated to grant two weeks' additional pay, but could choose to grant vacation instead and lower the total cash outlay. Termination precluded exercise of that choice.

[2] 61 Stat. 156, 29 U. S. C. § 185 (a). This position is supported by the legislative history discussed in *NLRB* v. *C & C Plywood Corp.,* 385 U. S. 421, at 427.

I think the Board and the Court of Appeals were correct in disregarding the contract issue. In *NLRB* v. *C & C Plywood Corp.*, *supra*, which the Court says upholds jurisdiction to consider the contract, we faced a situation in which an employer had taken a unilateral action with respect to wages which was a prima facie violation of § 8 (a)(3) and was attempting to justify that action by contractual privilege. The Court held that the interposition of a contractual defense could not deprive the Board of jurisdiction to "enforce a statutory right" where the Board had "not construed a labor agreement to determine the extent of the contractual rights which were given the union by the employer." *Id.*, at 428. Also the agreement involved in that case did not contain an arbitration clause and thus the strong policy favoring arbitration was not infringed by the Board's action. *Id.*, at 426. Here the Court's statement of the issue would imply that the Board may consider an unfair labor practice founded solely on breach of a contractual duty, and the labor agreement seems to invoke the remedy of arbitration.[3] In these circumstances, I think the only issue properly before the Court is whether the employer's unilaterally declared vacation policy, considered on its own bottom, constitutes a violation of § 8 (a)(3) absent a showing of improper motivation by evidence independent of the policy itself.

The Court attempts to resolve this issue as well as the contractual one. In the Court's view an employer must "come forward with evidence of legitimate and substantial business justifications" whenever any of his actions are challenged in a § 8 (a)(3) proceeding. Prior to

---

[3] Article XIV of the contract provided that arbitration would not be required after one party had given notice of intent to terminate or modify the contract. This disclaimer clearly implies that arbitration would be required in the resolution of disputes arising under the contract.

today's decision, § 8 (a)(3) violations could be grouped into two general categories: those based on actions serving no legitimate business purposes or actions inherently severely destructive of employee rights where improper motive could be inferred from the actions themselves, and, in the latter instance, even a legitimate business purpose could be held by the Board not to justify the employer's conduct, *Labor Board* v. *Erie Resistor Corp.*, 373 U. S. 221; and those not based on actions "demonstrably so destructive of employee rights and so devoid of significant service to any legitimate business end," where independent evidence evincing the employer's antiunion animus would be required to find a violation. *Labor Board* v. *Brown*, 380 U. S. 278, 286. The Court is unable to conclude that the employer's conduct in this case falls into the first category, and has proposed its rule as an added gloss on the second whose contours were fixed only two years ago in *Brown*.

Under today's formulation, the Board is required to find independent evidence of the employer's antiunion motive only when the employer has overcome the presumption of unlawful motive which the Court raises. This alteration of the burden in § 8 (a)(3) cases may either be a rule of convenience important to the resolution of this case alone or may, more unfortunately, portend an important shift in the manner of deciding employer unfair labor practice cases under § 8 (a)(3). In either event, I believe it is unwise.

The "legitimate and substantial business justifications" test may be interpreted as requiring only that the employer come forward with a nonfrivolous business purpose in order to make operative the usual requirement of proof of antiunion motive. If this is the result of today's decision, then the Court has merely penalized Great Dane for not anticipating this requirement when arguing before the Board. Such a penalty seems par-

ticularly unfair in view of the clarity of our recent pronouncements that "the Board must find from evidence independent of the mere conduct involved that the conduct was primarily motivated by an antiunion animus," *Labor Board* v. *Brown,* 380 U. S., at 288, and that "the Board must find that the employer acted for a proscribed purpose." *American Ship Building Co.* v. *Labor Board,* 380 U. S. 300, 313.

On the other hand, the use of the word "substantial" in the burden of proof formulation may give the Board a power which it formerly had only in § 8 (a)(3) cases like *Erie Resistor, supra.* The Board may seize upon that term to evaluate the merits of the employer's business purposes and weigh them against the harm that befalls the union's interests as a result of the employer's action. If this is the Court's meaning, it may well impinge upon the accepted principle that "the right to bargain collectively does not entail any 'right' to insist on one's position free from economic disadvantage." *American Ship Building Co.* v. *Labor Board, supra,* at 309. Employers have always been free to take reasonable measures which discourage a strike by pressuring the economic interests of employees, including the extreme measure of hiring permanent replacements, without having the Board inquire into the "substantiality" of their business justifications. *Labor Board* v. *Mackay Radio & Telegraph Co.,* 304 U. S. 333. If the Court means to change this rule, though I assume it does not, it surely should not do so without argument of the point by the parties and without careful discussion.

In my opinion, the Court of Appeals correctly held that this case fell into the category in which independent evidence of antiunion motive is required to sustain a violation. As was pointed out in the Court of Appeals opinion, a number of legitimate motives for the terms of the vacation policy could be inferred, 363 F. 2d, at 134,

and an unlawful motive is not the sole inference to be drawn from the conduct. Nor is the employer's conduct here, like the super-seniority plan in *Erie Resistor, supra,* such that an unlawful motive can be found by "an application of the common-law rule that a man is held to intend the foreseeable consequences of his conduct." *Radio Officers* v. *Labor Board,* 347 U. S. 17, 45. The differences between the facts of this case and those of *Erie Resistor, supra,* are, as the parties recognize, so significant as to preclude analogy. Unlike the granting of super-seniority, the vacation pay policy here had no potential long-term impact on the bargaining situation. The vacation policy was not employed as a weapon against the strike as was the super-seniority plan. Notice of the date of required presence for vacation pay eligibility was not given until after the date had passed. The record shows clearly that Great Dane had no need to employ any such policy to combat the strike, since it had successfully replaced almost all of the striking employees.[4] The Trial Examiner rejected all union claims that particular actions by Great Dane demonstrated antiunion animus. In these circumstances, the Court of Appeals correctly found no substantial evidence of a violation of § 8 (a)(3).

Plainly the Court is concerned lest the strikers in this case be denied their "rights" under the collective bargaining agreement that expired at the commencement of the strike. Equally plainly, a suit under § 301 is the proper manner by which to secure these "rights," if they indeed exist. I think it inappropriate to becloud sound prior interpretations of § 8 (a)(3) simply to reach what seems a sympathetic result.

---

[4] By July 1, 1963, almost 75% of the striking employees had been replaced. By August 1, 1963, when the dispute over vacation pay was coming to a head almost 90% had been replaced. All strikers had been replaced by October 8, 1963.