DETROIT MOTION PICTURE PROJECTIONISTS UNION, LOCAL
199, IATSE, AFL-CIO v EMPLOYMENT RELATIONS COMMISSION

Docket No. 58394. Argued November 3, 1977 (Calendar No. 4).—
Decided November 20, 1978.

Detroit Motion Picture Projectionists Union, Local 199, IATSE,
AFL-CIO, filed an unfair labor practice charge with the Em-
ployment Relations Commission against the Ninety-Six Grand
Corporation, and others doing business as Krim Enterprises, on
behalf of two projectionists who were discharged from their
employment at the Farmington IV theater under a temporary
day-to-day work arrangement when a contract could not be
reached. After the employment ended, the theater owners
themselves acted as projectionists. The employer argued that
its actions were motivated solely by economic considerations
and not by anti-union bias. The Employment Relations Com-
mission agreed with the employer and dismissed the charges.
The Court of Appeals, J. H. Gillis, P.J., and Quinn, J. (R. E.
Noble, J., dissenting), affirmed (Docket No. 23702). Plaintiffs
appeal. *Held:*

The decision of the Employment Relations Commission is
supported by competent, material and substantial evidence on
the whole record. The theater was a new enterprise and the
defendants voluntarily sought out the union to fill the jobs
available. The negotiations failed to result in an employment
contract satisfactory to the parties and they reverted to the
positions they had been in before the defendants gave the
union the first opportunity to fill the new jobs. The only
interest of the two members of the union was a temporary day-
to-day work arrangement contingent upon the successful out-
come of the contract negotiations. The formal letter of termina-
tion requested by the union does not transform the arrange-
ment into a permanent hiring and a discharge from employ-
ment. The reasons proffered by the employer for expiration of
the temporary arrangement supported the decision of the Em-
ployment Relations Commission.

Affirmed.

REFERENCE FOR POINTS IN HEADNOTES
[1-3] 48 Am Jur 2d, Labor and Labor Relations §§ 1163-1171.

Justice Blair Moody, Jr., joined by Justice Williams, dissenting, concluded that once an employer recognizes a union as representing the bargaining unit for newly hired employees and the parties attempt to negotiate a permanent relationship, the employer cannot resolve its bargaining problems by eliminating the unit. The motive underlying an employer's conduct is not an element of the unfair labor practice of interfering with employees in the exercise of their rights to bargain collectively. The employer's action here, even if motivated by economic reasons and even if in good faith, was inherently destructive of the employee's important right to bargain collectively. The discharge of the very employees who were actively engaged in negotiating a labor agreement cannot be categorized as an inherent management prerogative providing immunity from challenge. Even in considering allegations of discriminatory action, when an employer's practice is inherently destructive of employees' rights and not otherwise justified, no specific evidence of intent to discourage union membership is necessary to establish a violation. Moreover, the employer's conduct in this case carried with it its own indicia of improper intent. The only reasonable inference that could be drawn from it was that the employer fired the projectionists because of their insistence upon union representation at the bargaining table. This conduct amounts to discriminatory action and a violation of the prohibition against using hiring practices to discourage union membership. The employer had no justifiable reason for taking such drastic measures. Alternative measures were available, such as a temporary "lockout" of the employees, or a temporary layoff or replacement of them, or paying the employees at the last rate offered by management.

68 Mich App 458; 242 NW2d 806 (1976) affirmed.

OPINION OF THE COURT

1. LABOR RELATIONS — UNFAIR LABOR PRACTICES — ECONOMIC REASONS.

   A decision of the Employment Relations Commission that employers had discharged a two-person bargaining unit for economic reasons and not as an anti-union measure and therefore were not guilty of an unfair labor practice is supported by competent, material, and substantial evidence on the whole record and is affirmed where the employers voluntarily sought out the employees' union to fill the jobs available in a new enterprise, negotiations with the union failed to result in an employment contract satisfactory to the parties, and after the employees were discharged the parties reverted to the positions

they had occupied before; the discharge was not inherently destructive of employee interests where the only interest of the two union members was a temporary day-to-day work arrangement contingent upon the successful outcome of the contract negotiations; a formal letter of termination requested by the union does not transform the arrangement into a permanent hiring and discharge from employment (Const 1963, art 6, § 28; MCL 423.16; MSA 17.454[17]).

DISSENTING OPINION BY BLAIR MOODY, JR., J.

2. LABOR RELATIONS — UNFAIR LABOR PRACTICES — INHERENTLY DESTRUCTIVE CONDUCT.

*Once an employer recognizes a union as representing the bargaining unit for newly hired employees and the parties attempt to negotiate a permanent relationship, the employer cannot resolve its bargaining problems by permanently dismissing all of the bargaining unit's members; the employer's action, even if motivated by economic reasons and even if in good faith, is inherently destructive of the employee's important right to bargain collectively (MCL 423.16; MSA 17.454[17]).*

3. LABOR RELATIONS — UNFAIR LABOR PRACTICES — IMPROPER MOTIVES.

*The only reasonable inference that the Employment Relations Commission could have drawn from discharge of two movie projectionists, who were the entire bargaining unit of employees, from their jobs because their union demanded the union wage rate for them was that the employer fired the projectionists because of their union membership and because of their insistence upon union representation at the bargaining table; this conduct in a case where less drastic measures were available amounted to discriminatory action and a violation of the statutory prohibition against using hiring practices to discourage union membership (MCL 423.16; MSA 17.454[17]).*

*Miller, Klimist, Cohen, Martens & Sugarman, P.C.* (by *Sheldon L. Klimist* and *Thomas L. Gravelle),* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Francis W. Edwards,* Assistant Attorney General, for defendant Employment Relations Commission.

*Honigman, Miller, Schwartz & Cohn* (by *John Sklar* and *Charles H. Tobias)* for defendants Ninety-Six Grand Corporation; and Sol Krim, Leonard Krim, Harry Krim and Mac Krim, doing business as Krim Enterprises.

COLEMAN, J. The temporary employment of both members of a two-person bargaining unit ended when a first contract agreement could not be reached. The question is whether an unfair labor practice under § 16 of the labor relations and mediation act (MCLA 423.16; MSA 17.454[17]) was committed. We affirm the Court of Appeals, which affirmed the Michigan Employment Relations Commission's finding that there was no unfair labor practice on this record.

The defendants own the Farmington IV Theatre. During late November of 1972, while the theatre was still under construction, they sought out the plaintiff union hoping to hire a union projectionist and relief projectionist. The defendants had in the past enjoyed a satisfactory relationship with the union, employing a number of its members at other theatres which they owned.

The defendants and the union met together several times over the course of the next few weeks to discuss a possible contract. However, no agreement was reached. During this initial discussion period, Robert Holmes, a union projectionist, was hired by Ringold Equipment Company to install the projection equipment in the theatre. Holmes installed the equipment and was paid by Ringold for his work. On the day the theatre was scheduled to open, the union agreed to let two of its members, Holmes and a relief projectionist, work as projectionists for two weeks, during which time further discussions were to take place regarding a possible contract. The defendants agreed to

pay the two members full union scale while the discussions continued. It was understood that this was only a temporary arrangement.[1]

The defendants and the union met together several more times during the next two weeks but they still could not reach an agreement on an initial contract. They did agree, however, to extend the temporary work arrangement on a day-to-day basis and to continue the contract discussions. On this basis, the members continued to work and the defendants continued to pay them full union scale.[2]

Nearly one month later, after several more meetings, the defendants and the union still had not been able to agree on an initial contract. Based upon the theatre's first month earnings, the defendants told the union that they could not pay

---

[1] The union's business representative, Archie Shelley, testified as follows about his dealings with one of the defendants, Sol Krim, on the day the theatre was scheduled to open:

"*A.* I took the agreement out to the theatre—the two-week agreement we were supposed to have, and he told me he was going to take it, I assume, to you—you are his attorney—and have you check it over. That was the way it was left. Subsequently, I never got the agreement.

"*Q.* But the idea when you spoke to him was that we are on a temporary basis and will be negotiating during this two-week period?

"*A.* That is correct.

"*Q.* On December 22nd, that was not a permanent agreement?

"*A.* No, that was not a permanent agreement.

"*Q.* To the best of your knowledge, did the Krims during that two-week period honor all of the terms of the temporary arrangement?

"*A.* Yes, he did."

[2] Mr. Holmes, the projectionist, understood that there was no permanent contract. He testified:

"*Q.* So when you went to work you knew you were not under contract?

"*A.* Correct.

*     *     *

"*Q.* Did Mr. Shelly tell you that 'during this period you are not under contract so be prepared at any time to be pulled off the job', or words to that effect?

"*A.* Maybe something to that effect."

full union scale and also meet their other expenses. They made an offer of one-half union scale. The union rejected this offer and said that nothing less than full union scale would be acceptable. The union then told the defendants that it was pulling its members off the job and the defendants said that the members' services were no longer needed. Contract discussions ended. Thereafter, the defendants themselves acted as projectionists.

The union later asked the defendants to send the two members a formal letter of termination. After receipt of this letter, the union filed unfair labor practice charges against the defendants.

The administrative law judge ruled that the defendants had been guilty of unfair labor practices. The Michigan Employment Relations Commission reversed in a split decision and dismissed the charges. The majority concluded *inter alia* that the defendants "were sincere in their economic protestations" and were motivated solely by economic considerations.[3] On rehearing the majority affirmed its original decision and stated that "the evidence persuades that the officers of the employer were, if anything, pro-union and not anti-union in their opinions and attitudes".[4] In addition, the majority found that "[t]he evidence establishes that both employees were furnished by the union under a hiring hall situation, and that the employment was for a temporary period while bargaining continued".[5] The majority concluded by emphasizing the unique factual circumstances of this case.

The Court of Appeals affirmed the MERC majority in a split decision. 68 Mich App 458; 242 NW2d 806 (1976).

---

[3] MERC majority opinion, p 8.

[4] MERC majority opinion on rehearing, p 4.

[5] *Id.,* p 2.

We also affirm. The MERC decisions are supported by competent, material and substantial evidence on the whole record. See Const 1963, art 6, § 28.

The theatre was a new business enterprise. The defendants did not have to hire union members to fill the job openings. They could have hired non-union projectionists or performed the work themselves. (They finally performed the work themselves.) Instead, they voluntarily sought out the union to fill the jobs weeks before the theatre was scheduled to open.

When many meetings failed to result in an initial contract satisfactory to both the defendants and the union, the parties went their separate ways. They reverted to the same positions they had occupied prior to the defendants' solicitation of the union. Neither side was in any better or any worse position than it had been in before. The only interest the two union members (the only members of the unit) had was a temporary day-to-day work arrangement contingent upon the successful outcome of the initial contract discussions. When those discussions ended unsuccessfully, their interests expired. No interests were destroyed. The formal letter of termination requested by the union does not transform the temporary consensual work arrangement and its expiration into a permanent hiring and a discharge.

In these unique circumstances, the case of *National Labor Relations Board v Great Dane Trailers, Inc,* 388 US 26; 87 S Ct 1792; 18 L Ed 2d 1027 (1967), does not apply and the reasons proffered by the employer for expiration of the temporary arrangement supported the MERC decisions.

Affirmed. No costs, a public question.

KAVANAGH, C.J., and LEVIN, FITZGERALD, and RYAN, JJ., concurred with COLEMAN, J.

BLAIR MOODY, JR., J. *(dissenting)*. The majority premises its decision on the assumption that the employees were hired only temporarily, conditioned upon whether a contract could be negotiated between the employer and the union. Accordingly, the majority opines that since the union and the employer reached an impasse in negotiations, the employees could be permanently dismissed. We dissent. We conclude that once an employer recognizes a union as representing the bargaining unit for newly hired employees and the parties attempt to negotiate a permanent relationship, the employer cannot resolve its bargaining problems by eliminating the unit.

I

The employer in the instant case urgently needed the expertise of union projectionists to set up and begin the operations of a projection room for the opening of a new motion picture theater. In view of this need, prior to the opening of the new theater, the employer contacted the union for the purpose of employing two experienced projectionists.

To assure the theater would open on time and operate continually during this crucial commencement period, the employer agreed to pay the projectionists the local union scale temporarily.

Negotiations to effectuate a permanent contract covering pay rate and other conditions were conducted over a two-month period. However, after the critical opening period had passed and the employer had time to train others to carry on the established projection room operations, the employer discharged the union projectionists.

Following the dismissal of the employees, the

union filed an unfair labor practice charge with
the Michigan Employment Relations Commission
(hereinafter MERC) pursuant to the Michigan La-
bor Mediation Act (hereinafter the Act), MCL
423.16; MSA 17.454(17). Specifically, the union
charged that the employer's conduct constituted
unfair labor practices under MCL 423.16, subds (1),
(3), (6); MSA 17.454(17), subds (1), (3), (6).[1] The
employer countered that the discharge resulted
solely from the economic reality of the situation.
The employer claimed it was not feasible to meet
the union pay scale demands.

The administrative law judge, Bert H. Wicking,
agreed with the union's position:

"Normally, where a union representative and an
employer bargain to impasse over wage rates, the em-
ployer, in order to get on with his business, may pay at
the rate of the employer's last offer. The union repre-
sentative may then acquiesce or strike. In either, im-
passe or strike situations, the employees retain their
status as employees. An employer has no right to
terminate an employment relationship because an em-
ployee, through his union, makes demands upon the
employer. The Act specifically protects employees'
rights to collectively bargain, free from threats or dis-

---

[1] MCL 423.16; MSA 17.454(17) provides:

"It shall be unlawful for an employer or any officer or agent of an
employer (1) to interfere with, restrain or coerce employees in the
exercise of their rights guaranteed in section 8; * * * (3) to discrimi-
nate in regard to hire, terms or other conditions of employment in
order to encourage or discourage membership in any labor organiza-
tion; * * * (6) to refuse to bargain collectively with the representative
of his employees, subject to the provisions of section 26."

Subsection (1), *infra,* refers to rights guaranteed in § 8 which
provides:

"It shall be lawful for employees, to organize together or to form,
join or assist in labor organization, to engage in lawful concerted
activities for the purpose of collective negotiation or bargaining or
other mutual aid and protection, or to negotiate or bargain collect-
ively with their employers through representatives of their own free
choice." MCL 423.8; MSA 17.454(8).

charge because of an employer's dislike of unions or because of dislike of a bargaining demand by a union."

The employer appealed and MERC, in a divided decision, dismissed the union's complaint. Significantly, there was no finding by MERC that the employees would be retained only if amicable salary arrangements were negotiated. However, the majority accepted the employer's explanation that the discharge of the union projectionists occurred for economic reasons and was not an attempt to discourage union activity.

William M. Ellmann, the dissenting MERC member, viewed the situation differently:

"In the instant case while it is apparent that the respondent participated in the collective bargaining process with the charging party, it is also clear that when respondent no longer desired to do so, it discharged the entire bargaining unit. The discharge of employees because they are represented by a union and demanded the union rates of pay plainly has the effect of discouraging union activity and is clearly a violation of the Act. Section 8 of the LMA [labor mediation act] provides employees with the right 'to negotiate or bargain collectively with their employers through representatives of their own free choice.' Section 16 of the LMA makes it unlawful for an employer 'to interfere with, restrain or coerce employees in the exercise of their rights guaranteed in Section 8.' No employer conduct can be considered more inherently destructive of such employee rights than the act of firing an entire bargaining unit because negotiations were not proceeding satisfactorily."

The Court of Appeals, in a split decision, affirmed the MERC determination. 68 Mich App 458; 242 NW2d 806 (1976). Judge R. E. NOBLE dissented from the majority's affirmance:

"The employer's action here, even if motivated by economic reasons and even in the total absence of animus, was 'inherently destructive' of important employee rights.

"There is no more important right of an employee than the right 'to negotiate or bargain collectively with their employers through representatives of their own free choice'. MCL 423.8; MSA 17.454(8). There is no clearer 'destruction' of that right than a permanent dismissal of all members of the bargaining unit. The discharge of employees because they are represented by a union that demands the union rate destroys union activity because it eliminates the union members." 68 Mich App 458, 465.

We agree with the conclusion of the hearing referee and the dissenting MERC and Court of Appeals members. The employer engaged in an unfair labor practice and a discriminatory practice prohibited by the Act.

## II

The union charged the employer with violating, *inter alia*, § 16, subds (1) and (3) of the Act. First, the union claimed that the employer interfered with the employees' right "to negotiate or bargain collectively with their employers through representatives of their own free choice".[2] Secondly, the union charged the employer with discriminating as to hiring or other conditions of employment in order to discourage membership in the union.[3]

Since pertinent provisions of the Act closely correspond with similar provisions of the National Labor Relations Act (hereinafter the NLRA), this Court has looked to the Federal courts for guidance in construing the Act. See, for example,

[2] See MCL 423.16(1); MSA 17.454(17)(1), *supra*.

[3] See MCL 423.16(3); MSA 17.454(17)(3), *supra*.

*Rockwell v Crestwood School Dist,* 393 Mich 616; 227 NW2d 736 (1975). Therefore, in evaluating the union's claims, we will examine the Federal cases which analyze § 8(a)(1) and § 8(a)(3) of the NLRA,[4] those provisions which parallel § 16(1) and § 16(3) of the Michigan Act.

In asserting a violation of § 16(1) of the Act, the union first claimed that the employer interfered with the employee's right to engage in a protected activity. Throughout the instant litigation, the employer has maintained that its firing of the union projectionists was motivated solely by economic considerations and, therefore, was not an unfair labor practice.

Our examination of pertinent Federal decisions clearly illustrates that a finding of animus by the employer is not a necessary element of a § 8(a)(1) NLRA violation, and by analogy not an element of a § 16(1) violation of the Michigan Act. The fact that an employer may act in good faith for economic considerations does not transform a clear interference with protected rights into an acceptable labor practice. *Michigan Employment Relations Comm v Reeths-Puffer School Dist,* 391 Mich 253; 215 NW2d 672 (1974). Unlike the union's second claim of discriminatory activities under § 16(3), the motive underlying an employer's con-

---

[4] Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 USC 158, provide:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title];

\* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

Sections 16(1) and 16(3) of the Michigan Act are virtually duplicates of these Federal provisions.

duct is not an element of this unfair labor practice charge.[5]

In *National Labor Relations Board v Burnup & Sims, Inc,* 379 US 21; 85 S Ct 171; 13 L Ed 2d 1 (1964), the employer discharged two employees who were not guilty of misconduct but were engaged in union organization activities. Mr. Justice Douglas stated:

"We find it unnecessary to reach the questions raised under § 8(a)(3) for we are of the view that in the context of this record § 8(a)(1) was plainly violated, *whatever the · employer's motive.* Section 7 grants employees, *inter alia,* 'the right to self-organization, to form, join or assist labor organizations'. Defeat of those rights by employer action does not necessarily depend on the existence of an anti-union bias.

\* \* \*

"That rule seems to us to be in conformity with the policy behind § 8(a)(1). Otherwise the protected activity would lose some of its immunity, since the example of employees who are discharged on false charges would or might have a deterrent effect on other employees. Union activity often engenders strong emotions and gives rise to active rumors. *A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith.* It is the tendency of those discharges to weaken or destroy the § 8(a)(1) right that is controlling. We are not in the realm of managerial prerogatives." *Burnup & Sims, supra,* 22-24. (Citations omitted; emphasis added.)

An employer may be immune from a primary

---

[5] *Crown Central Petroleum Corp v National Labor Relations Board,* 430 F2d 724 (CA 5, 1970); *National Labor Relations Board v Burnup & Sims, Inc,* 379 US 21; 85 S Ct 171; 13 L Ed 2d 1 (1964); *International Ladies' Garment Workers' Union v National Labor Relations Board,* 366 US 731; 81 S Ct 1603; 6 L Ed 2d 762 (1961); *National Labor Relations Board v Laney & Duke Storage Warehouse Co,* 369 F2d 859 (CA 5, 1966).

violation challenge under § 8(a)(1) (Federal) and § 16(1) (Michigan) only if the employer's activity can be categorized as an inherent management prerogative. Discharging the very employees who were actively negotiating a contemplated labor agreement through their representative is not an inherent management prerogative providing immunity from challenge.[6]

No more striking example of interference with the employees' protected right to bargain through representatives of their own choice could be conceived than the elimination of the bargaining unit for no reason other than the admitted purpose of avoiding wage demands. The precipitous action taken by the employer in firing the employees was a clear violation of § 16(1) of the Act.[7]

The Court of Appeals and MERC opinions focused on the union's second charge of alleged discriminatory action under § 16(3). MERC, as well as both parties, referred this Court to *National Labor Relations Board v Great Dane Trailers, Inc,* 388 US 26; 87 S Ct 1792; 18 L Ed 2d 1027 (1967). The MERC majority concluded that, under the *Great Dane* case, the fact-finder has discretion in deciding whether a discriminatory discharge occurred. MERC concluded that the two projectionists were discharged for sound economic reasons; that only incidental harm to the employees' rights was involved; and that no anti-union motivation on

---

[6] See *Crown Central Petroleum Corp, supra.*

[7] For a similar analysis, see *Knuth Bros, Inc,* 229 NLRB 1204; 95 LRRM 1229 (1977), where an employer refused vacation pay to replaced strikers under an established policy. A § 8(a)(3) violation was not found because there was no showing of unlawful motivation and because other non-striking, terminated employees were treated in the same manner. However, the denial of benefits to the strikers was a consequence of their protected activity and, therefore, was found to be a violation of § 8(a)(1) as a "clear threat of economic loss to employees for engaging in protected concerted activities".

behalf of the company precipitated the discharge action.

Nevertheless, even in considering § 16(3) allegations pursuant to the guidepost of *Great Dane,* when an employer's practice is inherently destructive of employees' rights and not otherwise justified, no specific evidence of intent to discourage union membership is necessary to establish a violation. *Radio Officers' Union v National Labor Relations Board,* 347 US 17; 74 S Ct 323; 98 L Ed 455 (1954); *American Ship Building Co v National Labor Relations Board,* 380 US 300; 85 S Ct 955; 13 L Ed 2d 855 (1965).[8]

We cannot accept the MERC conclusion that the employees' rights in this case were only incidentally affected. We find that the employer's action in destroying the bargaining unit by firing all the employees was discriminatory conduct that carried with it its own indicia of improper intent. The only reasonable inference that could be drawn by MERC from the destruction of the bargaining unit was that the employer fired the projectionists because of their union membership and because of their insistence upon union representation at the bargaining table. This conduct was so inherently destructive of the employees' interests that the employer should not be permitted to assert as an excuse an underlying business purpose pursued in good faith.

The discharge action of the employer amounted to unacceptable discriminatory action and a *per se* violation of § 16(3) of the Act. The employer had

[8] For a similar conclusion, see *Rushton & Mercier Woodworking Co,* 203 NLRB 123; 83 LRRM 1070 (1973), *enf* 86 LRRM 2151 (CA 1, 1974), where the NLRB held that it would be "inherently destructive of employee interests" for an employer upon the resumption of operations following an economic layoff to hire a whole new work force represented by one union to the exclusion of its laid-off employees who were represented by another union.

no justifiable reason for taking this drastic step. Alternative measures were available. Judge NOBLE, in his dissent, reflected several options available to an employer responding to allegedly excessive wage demands:

"[A]n employer may temporarily lock out the workers or temporarily lay them off when a strike is threatened or imminent.

"An employer may, at a minimum, temporarily replace striking workers, or may, in some situations, impose certain unilateral terms and conditions of employment. However, as we have concluded, an employer, facing an impasse in bargaining and fearing a union strike, may not permanently discharge employees represented by a union." 68 Mich App 458, 466-467. (Citations omitted.)

Additionally, the employer could have followed the standard employment practice of paying the employees at the last rate offered by management.

We would reverse and remand to the Michigan Employment Relations Commission for determination of an appropriate remedy as suggested by the dissenting opinion of Judge NOBLE.

WILLIAMS, J., concurred with BLAIR MOODY, JR., J.