NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GENERAL TIME CORPORATION,
Westclox Military Products
Division, Respondent.

No. 80–2116.

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1981.

Decided May 13, 1981.*

June 17, 1981.

---

* This appeal was originally decided by unreported order on May 13, 1981. See Circuit Rule 35.

The panel has subsequently decided to issue the decision as an opinion.

Mendelssohn McLean, N. L. R. B., Washington, D. C., for petitioner.

R. Dennis Claessens, Chicago, Ill., for respondent.

Before FAIRCHILD, Chief Judge, and SPRECHER and WOOD, Circuit Judges.

SPRECHER, Circuit Judge.

The National Labor Relations Board has applied to this court for enforcement of its order issued against the Westclox Military Products Division of General Time Corporation ("Company"). The question we must decide is whether substantial evidence on the record as a whole supports the Board's finding that the Company violated Sections 8(a)(1) and (3) of the National Labor Relations Act, ("Act")[1] by deferring payment of vacation pay to striking employees who were members of the United Steelworkers of America AFL–CIO–CLC ("Union").

## I

The Company is engaged in the production of military timing devices. The Union has served as the exclusive collective bargaining representative of the Company's production and maintenance employees since 1971.[2]

Each year, for the last 20 years, the Company has scheduled a plant shutdown and workforce vacation during the last two weeks in July. Since at least 1966, the collective-bargaining agreements between the parties have explicitly set forth that period as the Union members' first two weeks of annual vacation. These collective-bargaining agreements also contained a formula for determining the amount of vacation pay due based on the employees' "straight time" earnings during a portion of the "vacation year," which ran June 1 to May 31. The contracts did not set forth when vacation pay was to be received by Union members in relation to the time of the plant shutdown. Since 1966, however, all of the Company's employees have received vacation pay for the last two weeks in July on the Friday before the Monday that vacation was scheduled to begin.[3]

The most recent collective bargaining agreement ran from June 7, 1976 through June 2, 1979. The parties failed to reach an

1. Sections 8(a)(1) and (3), 29 U.S.C. § 158(a)(1) and (3), provide in pertinent part that it is an unfair labor practice for an employer:

 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 . . . . .

 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

2. The Union and its predecessor, the International Union of District 50, Allied and Technical Workers of the United States and Canada, with whom the Union merged in 1971, have represented the production and maintenance workers since 1941.

3. The single exception to this practice occurred during a strike in 1973. The Union struck after the parties failed to agree upon a new contract after the expiration of the previous contract. The strike continued through the traditional July shutdown. At that time, vacation pay was not distributed to Union members until a new contract was ratified. The Union did not file unfair labor practice charges in 1973.

The Company does not argue that the Union's failure to file charges in 1973 estops it from complaining of the Company's actions in 1979. But the Company argues that the withholding of vacation pay during the 1973 strike shows that the Company's actions in 1979 were consistent with past practice. We disagree. The traditional practice unquestionably was to distribute vacation pay prior to the July plant shutdown. We can draw no inferences from the practice in 1973, since it was an isolated occurrence and the fairness of the practice was never challenged or decided.

agreement upon a new collective bargaining agreement, and, consequently, the Union struck on June 3, 1979. The Union remained on strike until August 29, 1979, when a new contract was ratified by the Union membership.

During the strike, the Company engaged in its normal July shutdown. The plant was shut down from Monday, July 16, through Friday, June 27. The Company paid vacation pay to all non-Union employees on Friday, July 13. Among those receiving such payments on July 13 were skilled craft unit employees represented by the International Association of Machinists ("IAM") who did not cross the Union's picket line.

The Company did not distribute vacation pay to the striking employees on Friday, July 13. Nor did the Company pay vacation pay on other dates thereafter, when requested by the Union. By letter dated July 30, the Company notified the striking employees that it was "not quarreling that eligible employees have vacation pay coming" but "[s]ince we do not have a contract the question of when this vacation pay is payable is an unresolved issue." The striking employees did not receive their vacation pay until after August 29, when a new contract was ratified.

The Union instituted this proceeding before the N.L.R.B. in response to the Company's refusal to distribute vacation pay until the new collective bargaining agreement was ratified. The Board found, in agreement with the Administrative Law Judge, that the Company violated Section 8(a)(3) of the Act by deferring the payment of vacation pay of its employees because they were engaged in protected concerted activity. In addition, the Board also found that the refusal to pay vacation pay was a violation of Section 8(a)(1) of the Act.

The Board's order requires the Company to cease and desist from continuing the unfair labor practices and from, in any like or related manner, interfering with, restraining or coercing employees in the exercise of their rights guaranteed by Section 7 of the Act. The Board's order also requires the Company to make whole, with interest, all striking employees for any loss of wages they may have suffered as a result of the Company's failure to pay them vacation benefits on July 13. The Company must post appropriate notices, and, upon request, must make available to the Board or its agents, for examination and copying, all payroll records, time cards, personnel records and reports, and all other records necessary to analyze and compute the amount of backpay due. We enforce the Board's order.

II

An employer violates Sections 8(a)(1) and (3) of the Act if he unjustifiably denies accrued vacation pay to striking employes. *N.L.R.B. v. Great Dane Trailers, Inc.*, 388 U.S. 26, 32, 87 S.Ct. 1792, 1796, 18 L.Ed.2d 1027 (1967); *N.L.R.B. v. Knuth Bros., Inc.*, 584 F.2d 813, 816 (7th Cir. 1978); *Flambeau Plastics Corp. v. N.L.R.B.*, 401 F.2d 128, 135–36 (7th Cir. 1968), cert. denied, 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1969). Paying vacation benefits to a group of employees while withholding them from others is "discrimination in its simplest form." *Great Dane*, 388 U.S. at 32, 87 S.Ct. at 1796. Postponement, as well as outright denial, of vacation benefits to striking employees violates the Act. *See Allied Indus. Workers, AFL–CIO Local 289 v. N.L.R.B.*, 476 F.2d 868, 878 (D.C.Cir. 1973).

Thus, an employer is guilty of an unfair labor practice unless it can show that the refusal to grant vacation pay was justified in that it was motivated by legitimate objectives. *Great Dane*, 388 U.S. at 34, 87 S.Ct. at 1797, *System Council T–4 v. N.L.R.B.*, 446 F.2d 815, 819 (7th Cir. 1971), cert. denied, 404 U.S. 1059, 92 S.Ct. 740, 30 L.Ed.2d 747 (1972) ("Withholding accrued benefits from strikers is conduct 'inherently destructive' of employee rights and is an unfair labor practice unless the employer can prove a legitimate business purpose") (citations omitted).

The Company advances several justifications for its refusal to grant vacation pay to striking Union members on July 13. The Company acknowledges that members of the Union had already accrued their entitlement to vacation pay when the collective bargaining agreement expired on June 3, 1979. But the Company argues that it was not obligated to distribute the vacation pay to Union members on July 13, 1979 for two reasons. First, there was no contract in effect, and, therefore, no vacation period specified. Second, the Union had submitted vacation proposals to the Company which could have changed both the amount of vacation pay due in 1979 and the time of the initial two-week vacation period. In short, the Company argues, the vacation period was just another negotiable term in the contract; in the absence of a contract, there could be no contract violation.

We find the Company's argument disingenuous. The right to vacation pay arose from the expired contract, the past practices of the Company, and the actual shutdown and payment of vacation pay to non-Union employees in July, 1979. Neither the expiration of the old contract nor alleged uncertainty as to the terms of the new contract has any bearing on the Company's refusal to pay vacation benefits.

 First, even after expiration of a contract, employees' rights to traditional vacation pay do not expire. *Hi-Grade Materials Co.*, 239 NLRB 947, 956 (1978).[4] Even if a new collective bargaining agreement had never been reached, the Union members still would have been entitled to the accrued vacation pay. The contractual provision for vacation pay to accrue in the "vacation year" of June 1, 1978 to May 31, 1979, would be a nullity if a new contract was necessary to distribute the benefits accrued under the expired contract. The vacation period and payment date should be linked to the year in which the pay accrued. That the expired contract did not specify the date of vacation pay is not relevant. The vacation pay date had never been specified in previous contracts. Past practice clearly established the payment date as the Friday before the first Monday of vacation. To condition the receipt of benefits which accrued under the old contract on ratification of a new contract was plainly coercive.

In addition to being coercive, the Company's actions were discriminatory. The Company distributed vacation pay to IAM members, who honored the Union's picket line, and to salaried employees. The Company attempts to justify paying IAM members by pointing to the IAM contract, which specifically mentions the July 16 to July 29, 1979, shutdown. The Company cannot point to a similar contract for salaried employees, but claims that the shutdown period for salaried employees had also been definitely scheduled for that period. But the Company's attempt to distinguish Union employees is unconvincing. We cannot see how the Company can profess uncertainty as to whether the last two weeks in July would have been the Union members' vacation period, when the plant was shut down for all of the salaried and skilled craft employees during that period. This common type of plant-wide shutdown would seem to depend on all employees getting the same vacation period. It would strain common sense to find, as the Company would have us, that the shutdown was merely a bargained-for item, unique to the Union's contract.

The prohibition against withholding vacation benefits, first enunciated in *Great Dane*, has been applied to factual situations very similar to this one. For example, in *Wallace Metal Products, Inc.*, 244 NLRB No. 10 (1979), the Board found Section 8(a)(1) and (3) violations in an employer's

---

4. In *Hi-Grade Materials*, the Board found that an employer should have paid employees for a contractually agreed holiday (Labor Day). The Board adopted the Administrative Law Judge's decision, which stated:

Even if it is assumed, *arguendo*, that the contract was not continued on a day-to-day basis after September 6, payment for holidays was a practice of 10 years' standing, thus it was a condition of employment and the employees were entitled to pay for the holiday.

239 NLRB at 956.

failure to distribute accrued vacation pay to striking employees at the time of the usual plant vacation of the first two weeks in July. In *Wallace Metal,* the expired contract stated that the plant would be shut down for two weeks beginning "the first Monday of July of each year." 244 NLRB No. 10 at 15. In this case, the vacation dates had been specified for the three years covered by the contract. In both cases, the contract explicitly setting the shutdown had expired. In *Wallace Metal,* the Board held that accrued vacation pay must be paid at the "usual" time, despite the absence of a current contract specifying the date. We agree, and we see no relevant factual differences between the situation in *Wallace Metal* and the situation here. To conclude that an expired contract that had set a vacation period beginning "the first Monday of July of each year" fixes the vacation date, while a contract that sets a vacation date specifically for each year of the contract—but for the same time each year, the last two weeks of July—does not fix a vacation date would be absurd.

The Company's reliance on *G. C. Murphy,* 207 NLRB 579 (1973) is misplaced. In *Murphy,* the Board held that the employer did not violate Sections 8(a)(1) and (3) by requiring employees who honored a picket line, and thus were not working at the time of their scheduled vacations, to reschedule their vacations. Only those employees who had scheduled their vacations and then were not working when the vacations were to begin were affected. At the close of the strike, the union requested that the employees be given a lump sum vacation payment instead of time off with pay. The employer refused, stating that vacations would be rescheduled after the strike. The employer acted consistently with the existing contract, which required employees to take their vacation benefits in the form of time off with pay and not a lump sum. The Board found that the employer did not commit an unfair labor practice in following the terms of an existing contract where there was no proof of anti-union animus.

The situation in the case before us is different from the situation in *Murphy.*

Here, the Company cannot rely on an existing contract to justify its refusal to distribute vacation pay to Union members. Rather, the Company can only rely on the *non-existence* of a contract. As discussed above, we reject this reliance. In addition, unlike the employer in *Murphy,* the Company traditionally shut down the entire plant during the last two weeks in July. The Company followed this tradition in 1979, and it distributed vacation pay to all but striking Union members on the traditional date. Thus, the *Murphy* result offers no assistance to the Company.

■ Finally, the Company argues that vacation benefits were the subject of pending negotiations and, therefore, it was not bound to pay the accrued benefits on the traditional date. But the Board adopted the Administrative Law Judge's finding that the 1979 vacation benefits were not a subject of negotiations leading to the contract ratified in August, 1979. The Company argues that we should reject the Board's finding. We decline to reject this finding because it is amply supported by substantial evidence in the record as a whole. The record shows that the formula for calculation of vacation pay for the vacation year that ended May 31, 1979, was set by the expired contract. Moreover, the Union's proposals concerning a change in calculation of benefits were withdrawn prior to the strike. Although some testimony was disputed regarding whether the Union discussed taking the two-week vacation and pay after the strike, the ALJ and the Board found that the vacation pay issue never rose to the level of being a major bone of contention between he parties during the course of the strike. The resolution of conflicts in testimony is peculiarly within the domain of the trier of fact. *Electri-Flex Co. v. N.L.R.B.,* 570 F.2d 1327, 1331, 1332 (7th Cir.), *cert. denied,* 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). Thus, the Company cannot rely on the collective bargaining process to justify its refusal to distribute accrued vacation pay to striking Union members.

In summary, we find that neither the expiration of the contract nor the pending negotiations for a new contract can justify the Company's refusal to pay accrued vacation benefits to striking Union members on July 13, 1979, the traditional pay date. The Board properly found violations of Sections 8(a)(1) and (3) of the Act.

### III

The Board's remedial order requires the Company to pay interest on the vacation pay that was deferred from July 13 until August 29, 1979. Citing *F. W. Woolworth Co.*, 90 NLRB 289 (1950), *Isis Plumbing & Heating Co.*, 138 NLRB 716 (1962), *enf. denied on other grounds*, 322 F.2d 913 (9th Cir. 1963), and *Florida Steel Corp.*, 231 NLRB 651 (1977), the Company argues that interest on vacation pay accrues quarterly; thus, interest could accrue only if vacation benefits had been withheld beyond the quarter which ended September 30, 1979. The Company's interpretation of these cases is erroneous. These cases used quarterly accrual of interest on backpay awards because the amount of backpay due was calculated by offsetting actual quarterly earnings against each quarter of pay lost due to wrongful discharge. These cases do not imply that interest is not due for losses occurring over less than a quarter.

The purpose of allowing interest is to put the wronged employees in the position they would have been but for the unfair labor practice. *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). Interest has been routinely awarded in cases similar to the case before us. *See N.L.R.B. v. Knuth Bros., Inc.*, 229 NLRB 1204, 1206 (1977), *enforced*, 584 F.2d 813 (7th Cir. 1978); *Indiana & Michigan Elec. Co.*, 236 NLRB 986, 991 (1978), *enforced mem.*, 610 F.2d 811 (4th Cir. 1979). Here, the employees should have received vacation pay on July 13, 1979. They did not receive that pay until August 29, 1979. Thus, we find that the Board was well within its remedial authority to charge interest in order to compensate the Union members for the delayed payment.

For the foregoing reasons, we order enforcement of the Board's order.