**SOUTHCOAST HOSPITALS GROUP, INC., Petitioner/Cross-Respondent,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner.**

Nos. 15-2146, 15-2258

United States Court of Appeals, First Circuit.

January 20, 2017

Joseph D. Whelan, with whom Matthew H. Parker and Whelan, Corrente, Flanders, Kinder & Siket LLP were on brief, for Petitioner/Cross-Respondent.

Barbara Sheehy, Counsel, with whom Robert J. Englehart, Supervising Attorney, Matthew Bruenig, Attorney, Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel, John H. Ferguson, Associate General Counsel, and Linda Dreeben, Deputy Associate General Counsel, were on brief, for Respondent/Cross-Petitioner.

Before THOMPSON and KAYATTA, Circuit Judges, and BARBADORO,* District Judge.

BARBADORO, District Judge.

Southcoast Hospitals Group, Inc. was created through a merger of three hospitals. One of the hospitals has a union workforce, and the union's collective-bargaining agreement grants its members a hiring preference when filling union positions. In an effort to produce more even-handed hiring practices across its three hospitals, Southcoast adopted a policy that grants nonunion employees a similar hiring preference for nonunion positions. The union

---

* Of the District of New Hampshire, sitting by designation.

challenged the nonunion hiring policy, contending that it discriminates against union members in violation of section 8(a)(3) and (1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(3), (1). A divided three-member panel of the National Labor Relations Board ("Board") determined that the policy was invalid because it was not supported by a legitimate and substantial business justification. We vacate the Board's order and remand the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Southcoast's Hiring Policies

Southcoast was created through a 1996 merger of St. Luke's Hospital, Charlton Hospital, and Tobey Hospital. Only employees at Tobey are represented by a union. The union, 1199 Service Employees International Union United Health Care Workers East ("1199 SEIU"), represents approximately 215 technical, clerical, service, and maintenance employees out of a total of 550 employees at Tobey.[1] St. Luke's has approximately 2,700 nonunion employees, and Charlton has approximately 2,100 nonunion employees.

Union members have enjoyed a hiring preference when applying for union jobs at Tobey since at least the time of the merger. The union's 2011 collective-bargaining agreement, which was in effect during the relevant time period, provides in section 8.2 that "[v]acancies in bargaining unit positions [i.e., union positions] ... shall be filled on the basis of available qualified applicants. Among such qualified applicants, the most senior qualified applicant

shall be selected." Section 8.1 defines seniority in terms of time spent in union positions. When these provisions are read together, they bar Southcoast from considering any nonunion applicant for a union position unless all union applicants are unqualified for the position.

Southcoast developed its current policy for filling vacancies in nonunion positions in 1999. That policy—HR 4.06—divides applicants into two broad categories. "Internal Applicants" include all nonunion, regular-status employees, all temporary and per diem employees, and union members who belong to a union that "provides reciprocal opportunity to employees who are not members of the union for open positions at the unionized site." All other applicants are treated as "External Applicants." Among Internal Applicants, HR 4.06 provides that regular-status employees "will be given first consideration for job postings providing the regular status employee's qualifications substantially equal the qualifications of external candidates." Temporary and per diem applicants are considered after regular-status employees but before External Applicants. The policy bars Southcoast from recruiting or considering any External Applicant for a nonunion position until all qualified Internal Applicants have been interviewed. Because the union's collective-bargaining agreement includes a hiring preference for union members, they are treated as External Applicants under HR 4.06.

Southcoast's actual practice when filling vacancies in nonunion positions differs somewhat from the process specified in HR 4.06. Job openings are posted and

---

1.  Union workers at Tobey belong to one of three bargaining units: technical workers, licensed practical nurses, and registered nurses. 1199 SEIU represents both technical workers and licensed practical nurses. Each bargaining unit is protected by a separate collective-bargaining agreement. References in this opinion to the "union" refer to 1199 SEIU. When we refer to "union members," we mean members of 1199 SEIU's technical workers' bargaining unit.

advertised for all applicants at the same time. Applications are screened and qualified applicants are placed into one of three groups by the company's human resources department. Nonunion, regular-status applicants are considered in the first round. If no one is selected from the first round, union applicants are considered together with temporary and per diem applicants in the second round. All other applicants are considered in the third round if no one is selected from the first two rounds.

David DeJesus, a human resources official at Southcoast, was responsible for creating HR 4.06. DeJesus claims that he had received complaints from unnamed employees about union hiring preferences both while working at Southcoast and in a prior job at another company where union members enjoyed a similar preference. He asserts that the company adopted HR 4.06 as a "matter of equity." From his perspective, if the union excludes nonunion employees from the first round of consideration for union positions at Tobey, then "it should work the same way in the other direction."

## B. Enforcement of HR 4.06

Christopher Souza, a union worker employed at Tobey, applied for a building superintendent position at St. Luke's in May 2011. The following month, human resources coordinator Lucilia Darosa notified Souza that Southcoast had chosen another applicant. When Souza inquired as to why he had not been selected for an interview, Darosa provided a citation to HR 4.06 and explained that "[Southcoast] would not be able to consider you for the first round interviews as you currently work at Tobey in a [bargaining-unit] position." After reviewing HR 4.06, Souza

made a complaint to Lisa Lemieux, the union's organizer at Tobey from 2005 to 2012.

Union members had been complaining to Lemieux about their inability to obtain positions at St. Luke's and Charlton since 2005, but Souza was the first to direct Lemieux's attention to HR 4.06. Believing that HR 4.06 discriminated against union workers, Lemieux contacted approximately 100 members of the union to find any other individuals who had been denied employment at St. Luke's or Charlton. Three employees eventually responded. Two relayed information about their own experiences and the third pointed Lemieux to Noelia Nunes, a union member who had unsuccessfully tried to transfer to a nonunion position.

From July 2011 through December 2011, Nunes submitted six applications for positions at St. Luke's. For various reasons—controverted below but not relevant here—her first five applications produced no interview requests. Her sixth application resulted in an interview and a job offer in January 2012. Nunes accepted the position.

## C. Administrative Proceedings

The union commenced this action by filing an unfair labor practice charge with the Board's Regional Director. After investigating the charge, the Regional Director filed a complaint with the Board, claiming that HR 4.06 illegally discriminates against union members in violation of section 8(a)(3) and (1).[2] An Administrative Law Judge ("ALJ") held an evidentiary hearing and issued a decision sustaining the charge in June 2013. A divided three-member panel of the Board largely affirmed the

---

2. The complaint also asserted that Southcoast independently violated section 8(a)(1) of the NLRA but the charge was not sustained by the Board and it has no bearing on this appeal. ·

ALJ's ruling on September 16, 2015. Accordingly, the Board ordered Southcoast to rescind HR 4.06 and provide affirmative relief to Souza, Nunes, and other similarly situated members of the union. This appeal followed.

## II. STANDARD OF REVIEW

■ Decisions of the Board must be based on a solid legal foundation, they must be supported by substantial evidence, and they must be the product of reasoning that is neither arbitrary nor capricious. See Boch Imports, Inc. v. NLRB, 826 F.3d 558, 565 (1st Cir. 2016).

■ Substantial evidence exists where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." NLRB v. Hotel Emps. & Rest. Emps. Int'l Union Local 26, 446 F.3d 200, 206 (1st Cir. 2006) (quoting McGaw of P.R., Inc. v. NLRB, 135 F.3d 1, 7 (1st Cir. 1997)); see also Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 366–67, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) ("[W]e must decide whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion."). When determining whether substantial evidence supports the Board's conclusions, "[w]e must take contradictory evidence in the record into account." NLRB v. Int'l Bhd. of Teamsters, Local 251, 691 F.3d 49, 55 (1st Cir. 2012) (alteration in original) (quoting Howard Johnson Co. v. NLRB, 702 F.2d 1, 2 (1st Cir. 1983)). "[W]e may not 'displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo.'" NLRB v. NSTAR Elec. Co., 798 F.3d 1, 11 (1st Cir. 2015) (second and third alterations in original) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Nevertheless, "the Board 'is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands.'" Local 251, 691 F.3d at 55 (quoting Allentown Mack, 522 U.S. at 378, 118 S.Ct. 818).

■ The Board's reasoning must also conform to the Administrative Procedure Act's "scheme of 'reasoned decisionmaking.'" Allentown Mack, 522 U.S. at 374, 118 S.Ct. 818 (quoting Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Under this scheme, we must reject the Board's reasoning where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 601 (1st Cir. 2016). "A decision is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Craker v. Drug Enf't Admin., 714 F.3d 17, 26 (1st Cir. 2013) (quoting State Farm, 463 U.S. at 43, 103 S.Ct. 2856). A Board decision cannot survive review unless the Board "articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Grosso v. Surface Transp. Bd., 804 F.3d 110, 116 (1st Cir. 2015) (quoting State Farm, 463 U.S. at 43, 103 S.Ct. 2856). In the end, "[r]eview under the arbitrary and capricious standard is narrow and [we] may not substitute [our] judgment for that of the agency, even if [we] disagree[ ] with the agency's conclusions." River St. Do-

nuts, LLC v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009).

## III. ANALYSIS

This case is founded on a claim that HR 4.06 improperly discriminates against union workers at Southcoast in violation of section 8(a)(3) and (1) of the NLRA. Southcoast argues on appeal that the Board acted arbitrarily and without substantial evidence when it rejected Southcoast's contention that HR 4.06 serves its legitimate and substantial business interests. We resolve such disputes by using the analytical framework established by the Supreme Court in NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). See NLRB v. Borden, Inc. (Borden I), 600 F.2d 313, 320 (1st Cir. 1979). Accordingly, we begin by describing the Great Dane framework and then delve into the details of the parties' respective arguments.

The Court explained in Great Dane that "discrimination and a resulting discouragement of union membership" are necessary but not sufficient conditions to support a claim under section 8(a)(3) and (1). See id. at 32–33, 87 S.Ct. 1792. A viable discrimination claim also ordinarily requires proof that "the discriminatory conduct was motivated by an antiunion purpose." Id. at 33, 87 S.Ct. 1792; see also Radio Officers' Union of Commercial Telegraphers Union v. NLRB, 347 U.S. 17, 44, 74 S.Ct. 323, 98 L.Ed. 455 (1954) ("That Congress intended the employer's purpose in discriminating to be controlling is clear."). The general rule, however, is subject to exceptions. If the employer's conduct is "inherently destructive" of union members' rights under section 7 of the NLRA, 29 U.S.C. § 157, a violation may be proved without evidence of improper motive if the employer fails to prove that its actions can be justified as "something different than they appear on their face." Great Dane, 388 U.S. at 33, 87 S.Ct. 1792 (quoting NLRB v. Erie Resistor Corp., 373 U.S. 221, 228, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963)). Even if a business justification has been proved, an inference of improper motive may be drawn from the inherently destructive conduct itself and the Board remains free to "strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." Id. at 33–34, 87 S.Ct. 1792.

If instead the harm to union members' interests is "comparatively slight," an employer must respond to a discrimination charge with evidence that the challenged conduct serves "legitimate and substantial" business interests. Id. at 34, 87 S.Ct. 1792. A failure to meet this burden will result in a finding of liability without the need for evidence of improper motive. Id. But if a satisfactory business justification is proved, a violation cannot be established without proof of antiunion motivation. Id. Thus, when a challenged employment policy has only a comparatively slight effect on section 7 rights, a legitimate and substantial business justification has been proved, and no evidence of a discriminatory motive has been presented, the Board must allow the policy to stand without attempting to balance business justifications against employee interests.

Here, the Board does not argue that HR 4.06 is inherently destructive of union members' section 7 rights. Nor does the Board contend that the policy is the product of antiunion bias. Instead, it defends its ruling solely by claiming that Southcoast failed to prove that HR 4.06 serves a legitimate and substantial business interest. Accordingly, it is to this issue that we now turn.

Southcoast justifies HR 4.06 principally by claiming that it helps level the playing field between union and nonunion workers.[3] Because a nonunion employee cannot be considered for a union position unless no qualified union member applies for the position, Southcoast argues, it is only fair to grant nonunion employees a similar hiring preference when filling nonunion positions.

The Board did not question Southcoast's contention that HR 4.06 treats nonunion workers more like union workers than would otherwise be the case. Instead, it rejected Southcoast's level-playing-field justification because it determined that the policy goes too far and instead "does the opposite of 'level the playing field'" by disproportionately favoring nonunion employees over their union counterparts. Southcoast Hosps. Grp., 363 N.L.R.B. No. 9, 2015 WL 5451459, at *3 (Sept. 16, 2015). The Board based this determination on two subsidiary factual findings. First, it noted that the number of positions covered by HR 4.06 "pales in comparison" to the number of positions covered by the union hiring policy. Id. Second, the Board determined that HR 4.06 is unfair because it grants nonunion workers a hiring preference for vacant jobs at two facilities whereas the union hiring preference only covers jobs at a single facility. Id. These facts are significant, the Board reasoned, because they leave union members with a more limited "universe of job opportunities." Id. at *3 n.5. We conclude that these findings cannot serve as substantial evidence for the Board's decision.

HR 4.06 covers many more positions than the union hiring policy but it is by no means clear that this difference unfairly disadvantages union workers. As Board Member Miscimarra correctly noted in his dissent below, the probability that a covered employee will obtain a successful transfer under either policy cannot be determined by considering the number of positions covered by the policy without also accounting for the number of employees that the policy covers. See id. at *8 (Miscimarra, Member, dissenting in part). Because the ratio of covered positions to covered employees is substantially the same under both HR 4.06 and the union hiring policy, one cannot say that a nonunion employee is necessarily more likely than a union employee to obtain a successful transfer simply because HR 4.06 covers more positions. The Board appeared to concede this point in responding to the dissent when it stated that "HR 4.06 has a negative effect on represented employees, not because it makes it more difficult to be selected for a transfer, but because it limits the universe of job opportunities." Id. at *3 n.5.

The problem with the Board's reasoning is that it failed to further explain why union workers are disproportionately harmed by HR 4.06 simply because it covers more positions than are covered by the union hiring policy. As far as the record reflects, HR 4.06 discriminates against union employees just as the union hiring preference discriminates against nonunion employees. If the fact that HR 4.06 covers more positions than are covered under the union hiring policy does not leave a non-

---

**3.** Southcoast also asserts it enacted HR 4.06 to reduce complaints from nonunion employees about the union's hiring preference. In rejecting this proposed justification, the Board branded HR 4.06 a "solution in search of a problem" because Southcoast was unable to identify any nonunion employee who had complained about the union hiring policy. Southcoast Hosps. Grp., 363 N.L.R.B. No. 9, 2015 WL 5451459, at *3 (Sept. 16, 2015). We need not evaluate the Board's conclusion on this point because, as we explain below, the Board improperly rejected Southcoast's alternative justification for HR 4.06.

union worker with a higher probability of a successful transfer than her union counterpart, it is not apparent from the record that this aspect of HR 4.06 unfairly disfavors union workers. Accordingly, a finding that HR 4.06 covers more positions than are covered by the union hiring policy cannot by itself justify the Board's conclusion that the policy tilts the playing field too far in favor of nonunion workers.[4]

The Board also determined that HR 4.06 benefits nonunion workers at the expense of union workers because it gives nonunion workers a hiring preference for jobs at two facilities, whereas the union hiring preference covers only a single facility. Here again, the Board did not disclose its reasoning in its decision, except by noting that HR 4.06 "limits the universe of job opportunities" for union workers. Id. at *3 n.5. On appeal, however, it attempts to fill the gap with two arguments. First, it suggests that the dual-facility preference unfairly penalizes union workers because they are impeded from transferring to two facilities, whereas nonunion workers are only impeded from transferring to one. Second, the Board argues that a single-facility preference would be more beneficial to union members than the current dual-facility preference because "it would reduce the number of applicants who receive a preference over them for vacant positions at St. Luke's and Charlton."

On this sparse record, the Board's observation that HR 4.06 provides nonunion workers with preference at two facilities is simply another form of its observation that HR 4.06 provides preference for more positions. One might equally observe that HR 4.06 provides preference for more floors. In each case, the logical inquiry should be whether the ratio of material opportunities overall as compared to the number of people competing for those opportunities (and thus the chances of a given worker to benefit equally from his or her respective preference) is greater for nonunion workers than for union workers. As we have explained, merely noting that there are more opportunities—whether expressed in units of positions, floors, or facilities—by itself says little of relevance where the competitors for those opportunities are correspondingly aggregated. Thus, while nonunion workers get preference at two hospitals, they must also compete with workers from two hospitals, while the union workers, with preference at only one hospital, need compete only with workers from that hospital.

It is also troubling that the Board concluded that HR 4.06 tipped the playing field too far in favor of nonunion workers without making any attempt to determine how its judgment might be affected by other aspects of the hiring policies that leave union members at a comparative advantage. For example, HR 4.06 entitles Southcoast to select the best qualified candidate for a vacant nonunion position, even though qualified nonunion employees have also applied for the position. In contrast, Southcoast is required under the union hiring preference to hire the most senior, qualified union applicant for a vacant union position even if more qualified nonunion applicants have applied. Southcoast also grants union members preferential consideration over nonemployee applicants when filling nonunion jobs, whereas the record contains limited, if any, evidence that Southcoast affords nonunion employees a similar preference when filing union positions. In addition, HR 4.06 gives the union the right to have its members treated as

---

4. We note here that if there were evidence in the record of a substantial qualitative difference between the jobs available at Tobey and the other facilities, for example, this might be a different case—but no such evidence was presented to the Board.

regular-status Internal Applicants by agreeing to surrender its hiring preference for union positions.[5]

In rejecting HR 4.06, the Board focused its analysis solely on the greater number of employees and facilities covered by the nonunion hiring preference without also considering aspects of the policy that continue to leave nonunion employees less well off than their union counterparts. Two minor differences between HR 4.06 and the union's hiring policy that have little, if any, adverse effect on union members cannot serve as substantial evidence for a determination that HR 4.06 tilts the playing field too far in favor of nonunion employees when other unexamined differences between the policies continue to leave union members with a comparative advantage when they apply for vacant positions.

The Board nevertheless defends its decision by claiming in its brief on appeal that "[w]here an employer's discriminatory action is not necessary to achieve its stated goal, it lacks a legitimate and substantial business justification." It then argues that it was entitled to reject Southcoast's level-playing-field justification because Southcoast could have achieved its stated goal through less restrictive means by limiting its nonunion workers to only a single-facility hiring preference. We reject this argument because, as we have already explained, nothing in the record supports the conclusion that nonunion workers are given greater or more opportunities than union workers.

In Borden I, we reminded the Board that "it is neither our function nor the Board's to second-guess business decisions." Id. at 321.[6] While the Board remains free to reject a proffered business justification on the ground that it is "illogical," NLRB v. Borden, Inc. (Borden II), 645 F.2d 87, 88 (1st Cir. 1981), or that is not "reasonably adapted to the achievement of a legitimate end," NLRB v. Brown, 380 U.S. 278, 289, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), it may not invalidate an employment policy that accomplishes a legitimate goal in a nondiscriminatory manner merely because the Board might see other ways to do it.

Southcoast adopted HR 4.06 in an effort to treat its union and nonunion workers more even-handedly when filling vacant positions. HR 4.06 achieves this goal by treating nonunion employees more like union members than they otherwise would be treated. Because Southcoast's chosen method was reasonably adapted to achieve its stated goal, the Board lacked the power to reject HR 4.06 simply because it is not identical to the union hiring policy or because Southcoast might have achieved its goal through alternative means that were more beneficial to its union employees.

## IV. CONCLUSION

The Board's Decision and Order requiring Southcoast to rescind HR 4.06 and

---

5. The fact that the union did not so elect may well suggest that it sees the current playing field as still slightly tipped in its direction.

6. The Board contends that we disavowed Borden I in Statler Indus., Inc. v. NLRB, 644 F.2d 902, 905 n.4 (1st Cir. 1981) (subsequent history omitted). Our criticism of Borden I in Statler, however, was limited to a single sentence in the opinion that purported to address how the Board should resolve the claim on remand that the employer acted with an improper motivation if the employer was able to demonstrate that the challenged policy also serves a legitimate and substantial business interest. Here, the Board does not seek to defend its decision by arguing that HR 4.06 was the product of antiunion motivation. Accordingly, our criticism of Borden I in Statler, has no bearing on the resolution of the present case.

granting affirmative relief to affected employees is not supported by substantial evidence. Accordingly, the decision is <u>vacated</u> and the case is <u>remanded</u> for further proceedings consistent with this opinion.

