# United States Court of Appeals
## For the First Circuit

No. 20-1157

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

WANG THEATRE, INC.,

Respondent.

APPLICATION FOR ENFORCEMENT OF ORDERS OF
THE NATIONAL LABOR RELATIONS BOARD

Before[*]

Lynch, <u>Circuit Judge</u>,
and Saris[**], <u>District Judge</u>.

Jared D. Cantor, with whom Usha Dheenan was on brief, for
Petitioner.
Arthur Gershon Telegen, with whom Seyfarth Shaw LLP was on
brief, for Respondent.

---

[*]    Judge Torruella heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's decision.   The remaining two panelists
therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

[**]    Of   the   District   of   Massachusetts,   sitting   by
designation.

November 30, 2020

**LYNCH**, **Circuit Judge**.    The NLRB petitions for enforcement of its October 30, 2019 order reinstating its November 10, 2016 decision, which found that respondent Wang Theatre, Inc. (WTI) committed labor relations violations by failing to bargain with the Boston Musicians' Association (BMA).  We agree with WTI that the Board made errors of law and fact in certifying a bargaining unit which had no employees and deny enforcement of the petition.  Because we see no point in remanding, we vacate the Board's October 30, 2019 and November 16, 2016 orders.

## I. Background

On January 5, 2016, BMA petitioned the Board to become the union representative for musicians employed by WTI.[1]  WTI operates the Wang Theatre, part of the Citi Performing Arts Center (or Boch Center) in Boston.  BMA petitioned to represent local Boston-area musicians "sourced" by WTI to perform in shows brought to the Wang Theater by independent producers.

On January 12, 2016, WTI submitted a letter to the Regional Director, arguing BMA's petition should be dismissed.  It

---

[1]    Section 9 of the NLRA permits the Board to conduct elections and certify a union representative for a "bargaining unit" of employees.  See 29 U.S.C. § 159.  Once a unit is certified and a union representative is elected the employer must bargain with the union in good faith.  Id. § 158.  If the employer fails to do so, the Board may find the employer has committed an unfair labor violation and petition this court for an enforcement order. Id. § 160.

stated, "WTI has not employed any musicians since 2014." WTI also argued that in any event the producers, not WTI, controlled the musicians' terms of employment, and WTI had no control over the topics over which BMA wished to negotiate.

The NLRB Acting Regional Director held a representation hearing on January 13, 2016. WTI's general manager, Michael Szcepkowski, and BMA's Secretary-Treasurer, Mark Pinto, testified at the hearing and the parties submitted a number of exhibits. The exhibits included a list of the performances at WTI in the two years before the hearing, the number of hours worked by musicians in the past two years, wage scales for sourced musicians, examples of contracts between WTI and show producers, WTI and BMA's collective bargaining agreement which expired in 2007, examples of collective bargaining agreements between other venues and BMA, and a work history report of the work certain musicians performed at WTI. Both parties also submitted post-hearing briefing.

At the hearing, WTI argued again that there were no current employees in the proposed bargaining unit. Szcepkowski stated that in 2014 producers for two travelling Broadway musicals, Annie and White Christmas, asked WTI to source local musicians. WTI recruited eight musicians for the production of Annie and thirteen for White Christmas. In 2015 WTI hosted the traveling Broadway musical Elf, but did not source any musicians. The producers of Elf contracted directly with the American Federation

of Musicians to hire local musicians for that production, and WTI had no involvement in that process. Szcepkowski also stated WTI had agreed to host another traveling Broadway musical, The Wizard of Oz, in 2016. The contract was not yet finalized at the time of the hearing, but WTI had as yet received no request to source local musicians for that production either. WTI now informs us that Annie and White Christmas were the last productions to ask it to source musicians. It has not done so in over six years and has no plans to do so in the future.

Szcepkowski also testified about a bargaining agreement between BMA and WTI that was in place between 2004 and 2007. He stated the agreement lapsed because "[WTI] reached a point where . . . [it] felt that [it] could not bargain over things that [it] didn't control."

WTI reiterated its arguments in its post-hearing briefing, stating, among other things, "no musicians would be eligible [to vote in a union election] . . . under any prior-applied [eligibility] formula."

The Acting Regional Director rejected WTI's objections and ordered a union election. She first found that WTI was the sole employer of the sourced musicians. She accepted that WTI had not sourced local musicians in over a year and found "[WTI] could not predict when local musicians would be hired for a performance at the Wang." In light of these findings, it is uncontested that

under the Board's standard Davison-Paxon test for membership in a bargaining unit, WTI is correct that there were no voting-eligible employees in the proposed unit. 185 N.L.R.B. 21 (1978). But the Regional Director instead applied the more expansive Julliard School test. 205 N.L.R.B. 153 (1974). She stated, "the facts of this case show a 'special circumstance' aligned with that of Julliard School . . . . [because] [t]he petitioned-for musicians work irregular employment patterns."

Under the Julliard School test, musicians who performed in the 2014 production of Annie and White Christmas were eligible to vote in the union election for the bargaining unit. Finding that WTI employed the sourced musicians -- and that there were current employees in the unit under the expansive Julliard School standard -- the Board ordered a union election. Any musician "in the unit who worked for [WTI] on two productions for a total of five working days over a one-year period preceding January 22, 2016, or a total of fifteen days over a two-year period preceding January 22, 2016" was eligible to vote.

WTI timely filed a request for review of the Acting Regional Director's decision with the Board. WTI argued again that the she erred by certifying a bargaining unit that had no employees. It also challenged her finding that WTI employed the sourced musicians, and stated "there has been no work in the

putative unit in over a year." The Board denied WTI's request for review in a one-line order.

While WTI's request for review was pending, BMA was elected union representative for the sourced musicians who worked in the 2014 productions of Annie and White Christmas. After the election it attempted to bargain with WTI. WTI responded that it was "at a total loss as to what we could possibly bargain over at this time. As you know, there has not been a single employee in the unit since 2014. As you also know, the producers have been hiring their own musicians. . . . There does not appear to be anything for the BMA and WTI to negotiate about."

BMA then filed a charge with the Board, alleging WTI committed an unfair labor practice under Section 8(a)(1) and (5) by refusing to bargain.[2] The Board's general counsel issued a complaint. WTI timely responded, raising the same arguments it presented to the Acting Regional Director at the representation hearing, along with additional arguments that its refusal to bargain was reasonable even if the unit was properly certified.

The general counsel then moved for summary judgment because WTI "admit[ted] its refusal to bargain with [BMA]." The Board granted the general counsel's motion, rejecting WTI's

_____

[2]    Section 8(a)(5) makes it "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158.

arguments on the grounds that they had been raised and rejected at the representation hearing. Because WTI's refusal was not in dispute, the Board granted the general counsel's motion for summary judgment and ordered WTI to "cease and desist, to bargain on request with the Union, and, if an understanding is reached, to embody the understanding in a signed agreement."

WTI moved for reconsideration. The Board denied this motion because WTI had not shown that one of the limited circumstances where reconsideration is permissible under the NRLB's procedural rules was present. Acting Chairman Miscimarra wrote separately to emphasize the narrow grounds on which the Board's decision rested. He agreed with WTI that there was a "reasonable question regarding whether the Theatre currently employs any musicians." And he stated, "[o]n the one hand . . . I agree that the project-by-project employment that often occurs among musicians and other employees in the performing arts warrants specialized evaluation of questions regarding appropriate bargaining units and voter eligibility. Conversely, the Board cannot appropriately conduct an election when the bargaining unit consists of no employees." But because the issues could only be raised at the representation hearing, he concluded, "[a]t this juncture, [WTI's] arguments challenging 'employer' status can only legitimately be raised before a court of appeals if [WTI] decides to appeal the Board's test-of-certification order."

In 2017, the Board first petitioned this court for an enforcement order. Before we heard argument, however, the Board moved to remand for consideration of whether its then-recent decision in Hy-Brand Industrial Contractors, Ltd., 365 N.L.R.B. No. 156 (2017) changed the standard for determining whether a joint employment relationship existed in this case. We remanded the case. On October 30, 2019, the Board affirmed its original decision and reissued its original cease and desist order. In this second order the Board gave several reasons why the joint employer issue did not change its original analysis and reinstated its original November 10, 2016 order. The Board now petitions a second time for an enforcement order.

## II. Discussion

We review both the enforcement orders and the underlying representation proceeding for the purpose of "enforcing, modifying or setting aside in whole or in part the order of the Board." 29 U.S.C. § 159(d). "The Board must prove that the employer refused to bargain with the representative of a unit of 'employees' . . . that was properly certified." N.L.R.B. v. Ky. River Cmty. Care, Inc., 532 U.S. 706, 712 (2001) (citations omitted).

Because "the Board is primarily responsible for developing and applying a coherent national labor policy," N.L.R.B. v. Ne. Land Servs., Ltd., 645 F.3d 475, 478 (1st Cir. 2011) (quoting N.L.R.B. v. Bos. Dist. Council of Carpenters, 80

F.3d 662, 665 (1st Cir. 1996)), "[a] Board order must be enforced if the Board correctly applied the law and if its factual findings are supported by substantial evidence on the record." Id. (citing 29 U.S.C. § 160(e),(f); Yesterday's Children, Inc. v. N.L.R.B., 115 F.3d 36, 44 (1st Cir. 1997)). We consider the record as it was before the Board at the time of the hearing. Telemundo de P.R., Inc., v. N.L.R.B., 113 F.3d 270, 277 (1st Cir. 1997).

But this court does not "simply 'rubber stamp' the decisions of the Board." Yesterday's Children, Inc., 115 F.3d at 44. "We review the Board's conclusion[s] of law de novo." Posadas de P.R. Associates, Inc. v. N.L.R.B., 243 F.3d 87, 90 (1st Cir. 2001) (citing N.L.R.B. v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 22 (1st Cir. 1999)); see also N.L.R.B. v. Int'l Broth. Of Teamsters, Local 251, 691 F.3d 49, 55 (1st Cir. 2012) (quoting same). Importantly, "[t]he Board is not free to ignore its own precedent." Yesterday's Children, Inc., 115 F.3d at 45 n.15. "[T]he NLRB cannot depart from its own precedent unless it articulates reasons for the departure." Good Samaritan Medical Center v. N.L.R.B., 858 F.3d 617, 640 (1st Cir. 2017) (citation omitted).

WTI argues the Board erred as a matter of law and fact in certifying a bargaining unit of sourced musicians at WTI for a

number of reasons.[3]  We address only its first argument that there were no employees in the bargaining unit because WTI had not sourced musicians since 2014 and had no plans to and had not been requested to do so for any future production.  We agree the Board misapplied the law and its own case law in certifying a no-employee bargaining unit.[4]  The Board has not adequately explained this departure from its own case law.

Prior precedent of the Board has set out the fundamental requirements for certifying a collective bargaining unit.  A collective bargaining unit must consist of at least two employees.

---

[3]  WTI also argues that (1) when WTI did source musicians, they were employed by the producers, or at least jointly employed by both the producers and WTI, so it was inappropriate to certify a unit with WTI as the sole employer; (2) WTI has no control over the topics over which BMA wishes to negotiate; and (3) BMA is attempting to use the bargaining process for an unlawful purpose.

[4]  The Board argues that our decision in Massachusetts Society For Prevention of Cruelty to Children v. N.L.R.B., 297 F.3d 41, 45 (1st Cir. 2002), requires us to give considerable deference to the Board's "selection of an appropriate bargaining unit."  But Massachusetts Society does not require us to defer to the Board's legal conclusions or permit it to disregard its own precedents.  Posadas de P.R. Associates, Inc., 243 F.3d at 90; Yesterday's Children, Inc., 115 F.3d at 45 n.15.  Moreover, the issue WTI raises in this appeal regarding whether there were any members of the proposed bargaining unit was not raised in Massachusetts Society.  There, we deferred to the Board's judgment as to whether each facility that the employer operated should be a separate bargaining unit or whether the bargaining unit should encompass similar employees at different facilities.  297 F.3d at 46.  We did not reach the question of the deference we give to the Board's formula for calculating the number of eligible employees in the units it has selected.

- 11 -

Foreign Car Center, Inc., 129 N.L.R.B. 319, 320 (1960). "[T]he principle of collective bargaining presupposes that there is more than one eligible person who desires to bargain." Id. An employer need not bargain with a single- or no-employee bargaining unit if it "does not need or intend to hire . . . [additional workers]." Westinghouse Electric Corp., 179 N.L.R.B. 289, 289 (1969).

The Board's "longstanding and most widely used test" to determine the membership of a bargaining unit at any given time is the Davison-Paxon formula. Trump Taj Mahal Assocs., 306 N.L.R.B. 294, 295 (1992) (citing Davison-Paxon Co., 185 N.L.R.B. at 23-24). The Board has repeatedly endorsed the Davison-Paxon test. See Columbus Symphony Orchestra, Inc., 350 N.L.R.B. 523, 524 (2007) ("The Board has made it clear that the Davison-Paxon formula should be followed absent a showing of special circumstances." (citations omitted)); Trump Taj Mahal Assocs., 306 N.L.R.B. at 295 ("[N]o single eligibility formula must be used in all cases, [but] the Davison-Paxon formula . . . is the one most frequently used, absent a showing of special circumstances."). Under this test, any employee who "regularly averages 4 hours [of work] or more per week for the last quarter prior to the eligibility date [in a particular bargaining unit]" is a member of that unit. Davison-Paxon Co., 185 N.L.R.B. at 24. It is undisputed that none of the musicians met this eligibility test.

In "special circumstances" the Board has applied a more expansive standard. The Julliard School formula is one such special test. In Julliard School the Board certified a bargaining unit of stage hands and other theater staff who worked at the Julliard School theater. The Board certified a bargaining unit comprising of "all employees of who have been employed by . . . [the Julliard School] during two productions for a total of 5 working days over a 1-year period, or who have been employed by . . . [Julliard] for at least 15 days over a 2-year period" -- the same criteria the Board applied in this case. 208 N.L.R.B. at 155.

In Julliard School the Board stated it used this more expansive test because "the record show[ed] that many of the[] [Julliard] employees work for periods of time which indicate repetitive employment and which permit them reasonably to anticipate reemployment in the near or foreseeable future." Id. at 154. The Julliard School relied on up to 155 stage hands, including dozens of employees in its props, costume, and makeup departments. Id. at 153-54. But because it staged fewer productions than commercial theaters and generally had lower production values than commercial productions, all stage hands (including carpenters, painters, and electricians), maintenance staff, and employees in the costume, makeup, and props departments, were employed on a per diem basis. Id. at 153. The total number

of per diem employees ranged from 0 to 155 depending on the time of year.  Id.  But many stage hands were nonetheless longstanding employees of the Julliard School.  Julliard "ma[de] a practice of hiring employees who [were] experienced with the facilities at Julliard and ha[d] proven through past performance their capacity to perform their job functions."  Id. at 154.  These stage hands were essential to Julliard's core function as a teaching theater. Id. at 155.

The Board stated Julliard's unique situation as a training theater made it "not comparable" to the commercial New York City theater industry.  Id. at 154.  "Julliard's theatrical productions [were] not extravagant commercial undertakings which may run for many weeks and which employ large, highly experienced casts."  Id.  "[U]nder the circumstances" of that case the Board found that a permissive unit eligibility standard was appropriate. Id. at 155.  The key consideration was that Julliard employed a large, stable number of "per diem" workers who reasonably expected to work in the future.

In Kansas City Repertory the Board upheld the Regional Director's use of the Julliard School formula to certify a unit of musicians who performed at the Kansas City Repertory.[5]    356

---

[5]    In reviewing the Regional Director's decision, the Board never reached the issue of whether the Davison-Paxon formula would have been more appropriate, because the Repertory argued only that

- 14 -

N.L.R.B. 147, 147 (2010). The Repertory produced and staged approximately seven or eight productions a year. Id. at 149. The performance season ranged from nine and a half to ten months each year. Id. The Repertory hired musicians "as needed" for the subset of productions that required live music. Id. The Repertory regularly staged musical productions each season, although the type of music and the musicians it employed might vary. Id. But for some employees there was a foreseeable expectation of future employment. Notably, in Kansas City Repertory all of the employees petitioning for union representation would have been eligible under the Davison-Paxon test. Id. at 150. Indeed, the musicians seeking union representation in Kansas City Repertory argued in favor of applying the Davison-Paxon formula. Id. The Board found that the Regional Director "properly processed" the petition. Id. at 147. The Regional Director applied the Julliard School standard to avoid the risk that Davison-Paxon would exclude other eligible employees who worked at the Repertory less frequently because of the seasonal nature of the work, and the fact that the types of musicians who were employed might vary somewhat based on the artistic decisions the Repertory made for a given year. Id. at 150-51. As in Julliard School, at the representation hearing the Regional Director recognized "[a] critical consideration in such

no formula was appropriate when all of the employees in a proposed bargaining unit are part-time or temporary. 356 N.L.R.B. at 147.

- 15 -

an analysis is the employment pattern that is the result of the length and number of relevant productions put on by the employer as well as the extent that the employer relies on on-call or per diem employees to perform its work."  Id. at 150.

In other cases, the Board has declined to extend the Julliard School formula.  In Columbus Symphony Orchestra the Board reversed a representation hearing decision applying the Julliard School formula to part-time stage-hands who assisted with seasonal productions at a professional theater.  350 N.L.R.B. at 523.  The Board noted that "in recent years . . . it has consistently applied the standard Davison-Paxon formula to entertainment industry employers that operate on a year-round basis."  Id. at 524.  In Columbus Symphony Orchestra, the fact that per diem workers worked at sporadic events, like summer outdoor venue performances, and supplemented a large permanent workforce year-round, was not a special circumstance justifying departure from the Davison-Paxon formula.  Id. at 525.  Of particular importance to the Board, "the employment pattern over the past several years d[id] not establish that stagehands who worked during the summer of 2006 could reasonably expect they would be employed in the summer of 2007." Id.

The Board also reversed the Regional Director's decision to apply the Julliard School formula in Steppenwolf Theatre Co., 342 N.L.R.B. 69, 71 (2004).  In Steppenwolf the Board stated

"[b]ecause [Steppenwolf] is a professional theater company and not an educational institution, its production schedule is much more regular and constant than was the Julliard School's." Id. According to the Board, "[b]ecause the Regional Director considered the Employer's industry to be the most significant factor in applying the Julliard formula, she failed to consider the Employer's substantially greater size and the regularity of its operations, the use of full-time staff to perform the vast majority of work, and the much higher number of hours worked by many individuals in its part time staff." Id. at 72. In Wadsworth Theatre Mgmt., 349 N.L.R.B. 122, 123 (2007) the Board again held that the Julliard School formula should not be applied to a professional theater that used part-time or per diem workers for only a small portion of its operations.

The Acting Regional Director's decision to use the Julliard School formula here is contrary to each of these precedents.[6] The NLRB decisions since Julliard School make clear that the Board's decision in that case rested on the particular facts of that case. See, e.g., Columbus Symphony Orchestra, 350 N.L.R.B. at 324-25. WTI is not factually similar to Julliard.

---

[6] In its brief, WTI further argues "Congress has rejected" the approach the Board took at the representation hearing. Because we find that the Board failed to adequately justify its approach under its own precedents, we do not reach the statutory question WTI raises.

WTI is a professional theater that does not produce its own shows, and it exercises no artistic control over the performances at the theater. Julliard was a non-profit teaching theater, producing and staging student-run performances. Importantly, Julliard employed a stable group of per diem workers who were critical to Julliard's mission. Julliard School, 208 N.L.R.B. at 154. It could not function as a teaching theater without regular, experienced stagehands and costume, props, and makeup departments. Id. at 153. In contrast, to the extent WTI employed musicians at all, it did so as an added service for producers who brought shows to the Wang. Sourced musicians were not central to WTI's operations -- and, in fact, it has continued to operate for over six years without them. Nor could sourced musicians reasonably expect future employment with WTI. At the time of the representation hearing WTI had not sourced musicians in over a year and had no specific plans to do so in the future. The Acting Regional Director did not address any of these factual differences when deciding to apply the Julliard School formula.

Further, the Acting Regional Director did not conduct any analysis of the "critical consideration . . . of the length and number of relevant productions put on by the employer as well as the extent that the employer relies on on-call or per diem employees to perform its work." See Kansas City Repertory, 356 N.L.R.B. at 150. Sourced musicians played only a tangential role

- 18 -

in WTI's overall operations, and WTI employed them, if at all, only sporadically.  An analysis of this "critical" issue would have weighed strongly against applying the Julliard standard to WTI.

Instead, the Acting Regional Director focused on a consideration that is not a "special circumstances" warranting departure from the Davison-Paxon formula under the Board's existing case law.  The Acting Regional Director stated "[t]he Board has found that 'special circumstances' include irregular employment patterns within the entertainment industry."  Yet in Steppenwolf Theatre and Columbus Symphony Orchestra the Board reached the opposite conclusion -- stating that Davison-Paxon remained the usual test for part-time employment in entertainment industry.  342 N.L.R.B. at 72; 350 N.L.R.B. at 524.

The Acting Regional Director also appeared to give great weight to the fact that WTI and BMA had reached a bargaining agreement in 2004, even though that agreement expired nearly ten years prior to the representation hearing.  She relied on Szcepkowski's testimony that the division of authority between producers and WTI had not changed since 2007, when the prior bargaining agreement lapsed.  Yet Szcepkowski stated at the hearing that agreement lapsed because WTI felt that it no longer controlled the topics over which BMA wished to negotiate.  Nothing in the record indicates that the business had not changed between 2004,

when WTI entered into the bargaining agreement, and 2016, when the representation hearing occurred.

By applying the Julliard School formula in this case, the Board disregarded its precedents. It did not consider the factual differences between Julliard School and this case, or the "critical consideration" identified in Kansas City Repertory, or its decisions in Steppenwolf Theatre and Columbus Symphony Orchestra, which found that the Davison-Paxon formula should ordinarily apply to part-time workers in the music industry. And it gave no reasons for departing from its own well-established law in this area. See Good Samaritan Medical Center, 858 F.3d at 640. We conclude it was a legal error, and contrary to the Board's own precedents, not to apply the Davison-Paxon formula in this case.

Under the appropriate formula, certifying the bargaining unit clearly violated the prohibition against empty bargaining units set out in Foreign Car Center, Inc., 129 N.L.R.B. at 320. It is uncontested that no one would have been eligible to vote in the union election under the Davison-Paxon formula, so the bargaining unit -- properly defined -- did not contain a single member.[7] For that reason, the Board has not met its burden to

_____

[7] The Board claims that by stating that it has not sourced musicians in over six years "[WTI] . . . seeks to draw the Court's attention to alleged factual developments outside the hearing record, which impermissibly shifts the focus from the record evidence as it existed before the Board." See Telemundo de P.R., Inc., 113 F.3d at 277 (court of appeals may not consider evidence

"prove that the employer refused to bargain with the representative of a unit of 'employees' . . . that was properly certified." <u>Ky. River Cmty. Care, Inc.</u>, 532 U.S. at 712.

Accordingly, we deny the Board's petition for enforcement. Because there is no dispute that there were no employees at the time of certification in the BMA bargaining unit under the appropriate formula, we see no point in remand. <u>See</u> <u>N.L.R.B.</u> v. <u>Wyman-Gordon Co.</u>, 394 U.S. 759, 766-67 n.6 (1969). We vacate the Board's October 30, 2019 and November 10, 2016 orders without further proceedings. Costs are awarded to Respondent Wang Theatre, Inc.

---

not in the record before the Board at the time of the hearing). Our decision does not rest on the fact that no musicians have worked in the BMA bargaining unit in over six years. At the time of the hearing it was apparent that there were no employees currently working and no employees with a reasonable expectation of future employment.