# United States Court of Appeals
## For the First Circuit

No. 20-1589

NATIONAL LABOR RELATIONS BOARD,

Petitioner, Cross-Respondent,

v.

MAINE COAST REGIONAL HEALTH FACILITIES, d/b/a Maine Coast
Memorial Hospital, the sole member of which is Eastern Maine
Healthcare Systems,

Respondent, Cross-Petitioner.

APPLICATION FOR ENFORCEMENT OF ORDER OF THE NATIONAL LABOR
RELATIONS BOARD AND CROSS-PETITION FOR REVIEW

Before

Kayatta and Barron, Circuit Judges,
and Smith,* District Judge.

Eric Weitz, Attorney, National Labor Relations Board, with
whom Kira Dellinger Vol, Supervisory Attorney, Peter B. Robb,
General Counsel, Alice B. Stock, Deputy General Counsel, Ruth E.
Burdick, Acting Deputy Associate General Counsel, and David
Habenstreit, Assistant General Counsel, were on brief, for
petitioner, cross-respondent.
Joshua A. Randlett, with whom Brent A. Singer and Rudman
Winchell were on brief, for respondent, cross-petitioner.

---

* Of the District of Rhode Island, sitting by designation.

May 26, 2021

**SMITH**, **District Judge**.  We review a decision and order of the National Labor Relations Board ("Board" or "NLRB"), which concluded that Maine Coast Regional Health Facilities, d/b/a Maine Coast Memorial Hospital, the sole member of which is Eastern Maine Healthcare Systems ("MCMH"), violated federal labor laws by firing an employee for a letter she wrote to the editor of a local newspaper.  The Board also determined that MCMH committed a separate violation by maintaining a media policy prohibiting contact between employees and the media.  We affirm those conclusions.  However, we agree with MCMH that the Board improperly extended its remedy to MCMH's parent corporation, Eastern Maine Healthcare Systems ("EMHS"), which was not a party to the proceeding.  Thus, we grant the Board's application for enforcement, striking from the order the portions of the remedy requiring repudiation notices to be posted at locations other than MCMH.

## I. Background

In 2015, in response to ongoing operating losses, MCMH reorganized with EMHS as its sole corporate member.  EMHS is a healthcare network that maintains similar relationships with several other hospitals in Maine.  As part of the merger, EMHS installed its own employees in various management positions at MCMH.

Following the merger, MCMH cancelled the contracts of most physicians at the hospital, discharging some and forcing the remaining physicians to renegotiate their contracts, leading many to resign in protest. Around the same time, concerns about nurse staffing levels led to a new collective bargaining agreement with the nurses' union. Despite the new agreement, understaffing caused by MCMH's failure to replace departing nurses remained a problem for union members and others. Although they did not file formal grievances, the nurses protested by placing a sticky note on the locker of each departed nurse. Additionally, in 2017, leadership from the union presented a petition, signed by over sixty employees, to management. The petition bemoaned a lack of staffing, criticized the administration for inadequately supporting nurses, and demanded specific changes to achieve compliance with the nurses' contract and to address understaffing.

Karen-Jo Young, an activities coordinator in the rehabilitation area of the hospital, became aware of the concerns of the nurses' union and the physicians. She was present for conversations among nurses, physicians, and other staff regarding the effects of the physicians' departures and the nurses' understaffing. She also observed the sticky note locker protest. Moreover, she felt the effects of the understaffing ripple over to her work because her job involved helping with nursing activities. Finally, she read articles and letters to the editor in the

- 4 -

*Ellsworth American*, a local newspaper, discussing the labor disputes. One article described the nurses' petition and stated that, according to a nurses' union steward, the union had tried to follow the proper grievance procedures prior to submitting the petition.

Young submitted a letter to the editor of the *Ellsworth American*. In her letter, she referenced the previous newspaper pieces and expressed support for the nurses and doctors in their respective labor disputes. She applauded the nurses for submitting their petition, urged management to heed the nurses' staffing demands, and opined that they were rightly concerned about risks to patient safety posed by understaffing. She also criticized management as unduly allegiant to EMHS and out of touch with patient care, arguing that these shortcomings negatively affected hospital staff and the local community. Young did not discuss her letter with any other employee prior to submitting it.

Throughout these events, MCMH maintained the following media policy, which EMHS had instituted at all of its subsidiaries:

> No EMHS employee may contact or release to news media information about EMHS, its member organizations or their subsidiaries without the direct involvement of the EMHS Community Relations Department or of the chief operating officer responsible for that organization. Any employee receiving an inquiry from the media will direct that inquiry to the EMHS Community Relations Department, or Community Relations staff at that organization for appropriate handling.

Just hours after Young's letter was published, MCMH terminated her employment, citing the media policy. Prior to Young's discharge, no employee had ever been disciplined for violating EMHS's media policy. EMHS later revised the policy, adding a "savings clause" stating that the prohibition against contact with the media did not apply to communications "concerning a labor dispute or other concerted communications for the purpose of mutual aid or protection protected by the National Labor Relations Act."

General Counsel for the Board brought charges on behalf of Young. In the complaint, the respondent was named Maine Coast Regional Health Facilities, d/b/a Maine Coast Memorial Hospital. Partway through trial before the Administrative Law Judge ("ALJ"), though, the General Counsel requested a revision of the name in the complaint, citing a desire to enforce remedial measures at other EMHS locations. Following an off-the-record discussion between the parties, MCMH consented to revising the name to Maine Coast Regional Health Facilities, d/b/a Maine Coast Memorial Hospital, the sole member of which is Eastern Maine Healthcare Systems.

The ALJ found that MCMH made the decision to fire Young based solely on the letter,[1] and furthermore, that the letter was

_____

[1] The ALJ noted that, although management became aware that Young had previously been subject to discipline for communications to the board of directors regarding employee dissatisfaction prior

concerted activity protected by Section 7 of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 157, as well as union activity protected by Section 8(a)(3) of the Act, id. § 158(a)(3). Therefore, the ALJ concluded that Young's termination violated Sections 8(a)(1) and 8(a)(3) of the Act, id. § 158(a)(1), (3). The ALJ further held that MCMH's maintenance of the original media policy constituted an independent violation of Section 8(a)(1), and that the newly minted savings clause did not cure its unlawfulness. On review, the Board affirmed the ALJ's decision with one exception. Unlike the ALJ, the Board concluded that the addition of the savings clause did cure the unlawfulness of the original media policy. Accordingly, the Board ordered MCMH to reinstate Young with back pay, cease and desist from violating employees' labor rights, and post notices repudiating the previous media policy at all EMHS facilities where it had been in place. The Board then filed an application in this court for enforcement, and MCMH cross-petitioned for review.

## II. Standard of Review

We review a decision of the Board for "mistakes of law, lack of substantial evidence to support factual findings, and

_____

to terminating her employment, the decision to discharge was finalized before management gained knowledge of the previous discipline. Based on this timeline, the ALJ impliedly discredited the testimony of an MCMH executive that the discharge was based in part on the earlier disciplinary incidents.

- 7 -

arbitrary or capricious reasoning." Boch Imps., Inc. v. NLRB, 826 F.3d 558, 565 (1st Cir. 2016) (quotations and citation omitted). "Where the Board adopts the conclusions and reasoning of the ALJ, we review the ALJ's reasoning as if it were that of the Board." Id. "We may not substitute our judgment for the Board's when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" Yesterday's Child., Inc. v. NLRB, 115 F.3d 36, 44 (1st Cir. 1997) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

Because Congress has delegated to the Board the authority to implement national labor policy, we give considerable deference to the Board's interpretation of the Act so long as it is "rational and consistent with the Act." NLRB v. Curtin Matheson Sci., Inc., 494 U.S. 775, 786-87 (1990). We use a deferential lens even where the Board revises or reverses its previous interpretations of the Act, as "[t]he responsibility to adapt the Act to changing patterns of industrial life is entrusted to the Board." NLRB v. J. Weingarten, Inc., 420 U.S. 251, 266 (1975). However, "[t]he NLRB cannot depart from its own precedent unless it articulates reasons for the departure." NLRB v. Wang Theatre, Inc., 981 F.3d 108, 112 (1st Cir. 2020) (quoting Good Samaritan Med. Ctr. v. NLRB, 858 F.3d 617, 640 (1st Cir. 2017)).

On matters of fact, the Board's findings are conclusive "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). A finding of substantial evidence requires "more than a mere scintilla," and instead must be sufficient such that "a reasonable mind might accept [it] as adequate to support a conclusion." McGaw of P.R., Inc. v. NLRB, 135 F.3d 1, 7 (1st Cir. 1997) (quotations and citation omitted). We give "great weight" to the ALJ's credibility determinations. Quality Health Servs. of P.R., Inc. v. NLRB, 873 F.3d 375, 384 (1st Cir. 2017) (quotations and citation omitted).

## III. Discussion

1. Whether MCMH Violated the Act

Section 7 of the Act gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. These rights are protected by Section 8, which prohibits various unfair labor practices, two of which are at issue here. Under Section 8(a)(1), "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7 of the Act. Id. § 158(a)(1). Additionally, under Section 8(a)(3), it is an unfair labor practice

- 9 -

for an employer "by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization." Id. § 158(a)(3).

The Board found that Young's letter writing was concerted activity protected under Section 8(a)(1) and union activity protected under Section 8(a)(3). The Board therefore concluded that MCMH violated both provisions when it discharged her for writing the letter. MCMH takes several stabs at rebuttal, but none is fatal.

a. Concertedness

First, MCMH argues that there was insufficient evidence to show that Young engaged in concerted activity. Although the term "'concerted activity' plainly 'embraces the activities of employees who have joined together in order to achieve common goals, . . . the precise manner in which particular actions of an individual employee must be linked to the actions of fellow employees'" is not clear from the statutory text. NLRB v. Portland Airport Limousine Co., 163 F.3d 662, 665 (1st Cir. 1998) (quoting NLRB v. City Disposal Sys. Inc., 465 U.S. 822, 830 (1984)).

The Board's prevailing test for concerted activity is set out in Meyers Industries, Inc., 268 N.L.R.B. 493, 497 (1984) ("Meyers I"), and Meyers Industries, Inc., 281 N.L.R.B. 882, 885 (1986) ("Meyers II"). There, the Board explained that, in its view, "generally, an activity is carried out in a 'concerted'

manner for purposes of § 7 if it is 'engaged in with or on the authority of other employees.'" Five Star Transp., Inc. v. NLRB, 522 F.3d 46, 51 (1st Cir. 2008) (quoting Meyers I, 268 N.L.R.B. at 497). However, the Board allowed that concerted activity can also include "conduct engaged in by a single employee." Meyers II, 281 N.L.R.B. at 885. For instance, concerted activity extends to individual actions "seek[ing] to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." Id. at 887; see also id. (noting that "concerted activity" could cover "a myriad of [other] factual situations"). Notwithstanding the above-quoted language from Meyers I -- "on the authority of other employees" -- there is no requirement that concerted actions be "specifically authorized" by others. Meyers II, 281 N.L.R.B. at 886. Thus, "[t]he critical inquiry is not whether an employee acted individually, but rather whether the employee's actions were in furtherance of a group concern." Five Star Transp., 522 F.3d at 51 (citing Meyers II, 281 N.L.R.B. at 887).

The history behind the Meyers decisions is worth noting. In Alleluia Cushion Co., 221 N.L.R.B. 999 (1975), the Board held that, where an individual employee raises complaints of "obvious mutual concern," the support of other employees could be presumed, and concertedness could thus be found even absent "outward manifestation[s] of support" from other employees. Id. at 1000.

- 11 -

Meyers I rolled back this presumption and held that a finding of concerted activity must be based on objective evidence that the actions arose from group activity. See 268 N.L.R.B. at 496.

While Meyers II focused on actions directed towards management, concerted activity may also arise where employees use "channels outside the immediate employee-employer relationship" to air shared grievances. Eastex, Inc. v. NLRB, 437 U.S. 556, 565 (1978). Employee outreach to media outlets and governmental bodies has thus been found to be concerted activity. See Five Star Transp., 522 F.3d at 48-52 (affirming finding of concerted activity where bus drivers, following meeting with union, individually sent letters to school district raising group concerns); Allstate Ins. Co., 332 N.L.R.B. 759, 759, 765 (2000) (finding concerted activity where a group of employees criticized employer in magazine interview); see also Mount Desert Island Hosp., 259 N.L.R.B. 589, 592 (1981) (finding concerted activity pre-Meyers where nurse wrote letter to editor after discussions with other staff and subsequently circulated a petition that was published by the newspaper).

The Board's decision here may stand at the limits of the Meyers cases, and arguably takes a step back towards Alleluia's presumption of concertedness. Young was not a union member. The alleged understaffing of nurses affected her, but only indirectly. Most significantly, she did not discuss her plans to write a letter

- 12 -

with other employees or receive any specific direction, authorization, or even encouragement to do so.

Nonetheless, a labor dispute was being waged on multiple fronts, including in the court of public opinion. Young knew of these labor concerns by word of mouth and from her direct experiences of understaffing at the hospital. Furthermore, she had read pieces in the *Ellsworth American* about the dispute; one article described the nurses' petition and included an interview with a steward of the nurses' union.[2] Although no other employee had requested or approved Young's letter, many employees had expressed support for the cause she championed (increased staffing). Those employees had outwardly manifested their support through the petition, the sticky note protest, and conversations at the hospital. Therefore, Young acted in support of what had already been established as a group concern. See Five Star Transp., 522 F.3d at 51; Meyers I, 268 N.L.R.B. at 496 (providing that outward manifestations of support can establish that an issue

---

[2] Due to the hearsay contained within the newspaper articles, the ALJ ruled that they were admitted only for purposes other than the truth of the matter asserted. MCMH argues that the newspaper articles thus cannot support a finding of concerted activity. However, the articles were not used to prove the existence of the labor disputes or the nurses' petition, which were established through other evidence. Rather, the articles showed how Young learned about the petition and demonstrated that public discussions regarding the labor disputes were already playing out in the newspaper.

is of group concern).  Importantly, hospital employees had utilized the newspaper to amplify their message.  So, by contributing her voice to the newspaper platform, Young was acting with her coworkers in a meaningful, albeit indirect, way.  See Five Star Transp., 522 F.3d at 51 (noting that concerted activity must generally be "engaged in with or on the authority of other employees" (quotations and citation omitted)).  Section 7 protects employees' rights to "assist labor organizations . . . and to engage in other concerted activities," 29 U.S.C. § 157, and the Board reasonably concluded under its precedent that Young's letter fell within that provision's coverage.  While the facts here may be at the edge of the Board's definition of concerted activity from Meyers I and Meyers II, we conclude that the evidence was substantial enough to support the Board's finding.[3]

b. Mixed Motive

MCMH next contends that, even if Young's letter writing is deemed a concerted activity, the case should be remanded for application of the mixed-motive test from Wright Line, a Division

---

[3]  In addition to its findings regarding the unlawfulness of Young's termination, the Board also declared that MCMH's original media policy, irrespective of Young's termination, violated Section 8(a)(1).  MCMH contends that if this court overturns the finding of concerted activity, the court should consequently determine that the original media policy was lawful.  Because we affirm the finding that Young's letter writing was a concerted activity, we need not address this argument.

- 14 -

of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enforced on other grounds, 662 F.2d 899 (1st Cir. 1981), approved in NLRB v. Transp. Mgmt. Corp., 462 U.S. 393 (1983). In support, MCMH points to a recent Board decision expanding the applicability of the Wright Line inquiry. See Gen. Motors LLC, 369 N.L.R.B. No. 127, 2020 WL 4193017, at *1-2 (July 21, 2020).

Under the Wright Line test, for mixed-motive cases the General Counsel must first "make a prima facie showing 'that the employee's conduct protected by § 7 was a substantial or a motivating factor in the discharge.'" Good Samaritan Med. Ctr., 858 F.3d at 631 (quoting Transp. Mgmt., 462 U.S. at 399-400). If the General Counsel makes this showing, the employer may nonetheless avoid liability by rebutting the prima facie case or by proving that the employer would have discharged the employee, even absent the protected conduct, based on other, unprotected conduct. Id. (citing Transp. Mgmt., 462 U.S. at 400).

However, Wright Line is inapplicable where an employee's discharge is based upon a single act. See Five Star Transp., Inc., 349 N.L.R.B. 42, 46 n.8 (2007) (holding that where employer made hiring decisions based on letters to school committee, "the only issue presented is whether the letters constituted protected conduct"); Am. Steel Erectors, Inc., 339 N.L.R.B. 1315, 1316 (2003) (explaining that "Wright Line analysis [is] unnecessary in [a] single-motive case"); Phx. Transit Sys., 337 N.L.R.B. 510, 510

(2002) (holding <u>Wright Line</u> inapplicable where employer discharged employee "because of the articles he wrote in the union newsletter," which "constituted protected concerted activity"); <u>Nor-Cal Beverage Co.</u>, 330 N.L.R.B. 610, 612 (2000) (holding that "Respondent can rely on no independent motive" where the reason for discharge was a protected activity). Here, MCMH decided to discharge Young solely because of the letter, so <u>Wright Line</u> does not apply.

MCMH objects to the conclusion that Young was discharged because of her concerted activity, as it contends that she was not fired for the statements in her letter that involve the physician contracts, nurse staffing, or the union. Instead of sorting the statements in the letter into two baskets (protected and unprotected) and using the <u>Wright Line</u> test to determine which basket contained the true impetus for termination, the ALJ quite pragmatically treated Young's letter as a single act. As the ALJ concluded, the statements the hospital points to -- "those about management being out-of-touch and the chairwoman's allegiance to management" -- are directly tied to her ultimate argument for more staffing. <u>Me. Coast Reg'l Health Facilities</u>, 369 N.L.R.B. No. 51, slip op. at *16 n.14 (Mar. 30, 2020). Therefore, even under a piecemeal approach in which the letter is parsed sentence by sentence, all of the statements the hospital has identified are concerted activity. Moreover, to the extent that MCMH means to

contend that Young was terminated for damaging its reputation as opposed to for opining on the labor dispute, the ALJ concluded that the negative nature of Young's letter was "part of the res gestae of her protected protest about working conditions," and so under Board precedent a mixed-motive inquiry does not apply as that aspect of the letter cannot be separated out and serve as an independent legal basis for her termination.  Id.

Aware of this flaw in its argument, MCMH contends that the res gestae standard has been "overruled and invalidated."  It pins its hopes on the recent General Motors decision, in which the Board extended the Wright Line mixed-motive test to cases in which an employee engages in a single instance of abusive behavior that, apart from its abusive nature, would be protected under Section 7. See Gen. Motors, 369 N.L.R.B. No. 127, at *1-2.  But to no avail. In General Motors, the Board cabined its holding to cases involving abusive conduct, specifically exempting mere disparagement or disloyalty.  See id. at *9 n.16.

Here, Young expressed the following criticisms of MCMH's management: "[The] MCMH Board Chairwoman['s] . . . statement . . . sounds like complete allegiance to EMHS.  What happened to loyalty to our local hospital, staff and the patients and communities that have benefited by the consistent, dedicated, experienced care given by trusted local doctors?"  "Hospital management who work out of their offices and have meeting after meeting and who are

not working where patients are being cared for, but who then make decisions about staffing levels should be listening to those who are actually caring for patients." "[M]anagement keeps going to their meetings or are in their offices in their administrative building, far from the doctors and nurses and other staff who are working [in medical units of the hospital]." These measured critiques were not abusive, a term the Board has reserved for truly outrageous workplace conduct. See, e.g., id. at *1 (describing abusive conduct by an employee who had "unleashed a barrage of profane ad hominem attacks" and another employee who "shouted racial slurs while picketing" (footnotes omitted)). Thus, General Motors does not apply and provides no basis for remand.

Accordingly, the question presented was whether Young surrendered her Section 7 protection by including disparaging and false statements about hospital management and patient safety in her letter. In a thorough analysis, the ALJ concluded that the letter was not so inflammatory as to forfeit that statutory cloak of protection. For the following reasons, we affirm that conclusion.

"Where concerted activity entails communications with a third party . . . , such activity is protected if it meets a two-part test: (1) the communication indicates to the third party that it is related to an ongoing dispute between an employer and employees; and (2) the communication itself is not so disloyal,

- 18 -

reckless or maliciously untrue as to lose the Act's protection." Five Star Transp., 522 F.3d at 52 (quotations and citations omitted); see also NLRB v. Local Union No. 1229, Int'l Brotherhood of Elec. Workers (Jefferson Standard), 346 U.S. 464, 471 (1953). "[T]he critical question" is whether the "communications reasonably targeted the employer's labor practices, or indefensibly disparaged the quality of the employer's product or services." MikLin Enters., Inc. v. NLRB, 861 F.3d 812, 822 (8th Cir. 2017) (en banc).

Young's letter focused on ongoing disputes between MCMH management and staff, thus satisfying the first prong of Five Star Transportation. As for the second prong, the arguably disparaging statements were assertions that administrators gave "complete allegiance" to EMHS, spent too much time in meetings, and wrongfully disregarded input from nurses and other patient-facing staff. Rather than resorting to panic-inducing rhetoric, Young calmly articulated her strong disapproval of management's staffing decisions. Compared to statements that have lost protection due to their derogatory nature, these criticisms were circumspect. See, e.g., St. Luke's Episcopal-Presbyterian Hosps., Inc. v. NLRB, 268 F.3d 575, 581 (8th Cir. 2001) (holding unprotected "materially false and misleading" statement that hospital was "'jeopardizing the health of mothers and babies' by depleting its staff of labor and delivery [nurses], reducing the effectiveness of the remaining

[nurses] by increasing their duties, and providing less qualified replacements"); Coca Cola Bottling Works, Inc., 186 N.L.R.B. 1050, 1054 (1970) ("leaflet [distributed by striking Coca Cola employees] was [designed] to create fear in the public's mind that drinking Coca Cola would be harmful to the health of the purchaser because of the presence of foreign objects such as roaches and mice").

Furthermore, Young's letter did not impermissibly stray from her labor concerns when she posited that understaffing would diminish patient safety, as "patient welfare and working conditions are often inextricably intertwined" in the health care field. Valley Hosp. Med. Ctr., Inc., 351 N.L.R.B. 1250, 1252 (2007) (citing Brockton Hosp., 333 N.L.R.B. 1367, 1374-75 (2001), enforced in relevant part, 294 F.3d 100 (D.C. Cir. 2002); Misericordia Hosp. Med. Ctr., 246 N.L.R.B. 351, 356 (1979), enforced, 623 F.2d 808 (2d Cir. 1980)). Lastly, the only clear falsity in the letter was Young's statement that the union had followed proper grievance procedures -- which it had not -- prior to presenting its petition to management. However, Young made this error in reasonable reliance on the union steward's statement in the *Ellsworth American*. In sum, Young's criticisms were not so disloyal or disparaging as to shed their Section 7 armor.

c. Anti-Union Motive and Discouragement

We next turn to MCMH's criticisms of the findings underpinning the Section 8(a)(3) violation. Under that provision, an employer may not "encourage or discourage membership in any labor organization" "by discriminat[ing] in regard to hire or tenure of employment." 29 U.S.C. § 158(a)(3). This inquiry "turns on the employer's primary motivation." McGaw of P.R., 135 F.3d at 8 (citing Transp. Mgmt., 462 U.S. at 397-403).

Unlike Section 8(a)(1), which protects concerted activities even absent any connection to an extant or potential union, Section 8(a)(3) protects only union activities. See Gen. Motors, 369 N.L.R.B. No. 127, at *1 (noting that "discipline based on . . . Section 7 activity violates Section 8(a)(3) and (1) (or, when no union activity is involved, just Section 8(a)(1))"). Here, the ALJ justifiably concluded that Young's letter constituted union activity protected under Section 8(a)(3) -- in addition to concerted activity protected under Section 8(a)(1) -- because the letter lent support to the nurses' union in its labor dispute. See Pride Ambulance Co., 356 N.L.R.B. 1023, 1023, 1040 (2011) (holding that employer violated Section 8(a)(3) by terminating non-union employee who made "common cause with the striking employees" by refusing to replace striker); Beth Israel Med. Ctr., 292 N.L.R.B. 497, 498 (1989) (finding non-union employee's refusal to cross picket line to be protected union activity); Signal Oil

& Gas Co., 160 N.L.R.B. 644, 645, 649 (1966) (holding that employer violated Section 8(a)(3) because termination of non-union employee for "expression of support for the proposed union activity of his fellow employees . . . would tend to discourage membership in a labor organization"), enforced, 390 F.2d 338 (9th Cir. 1968).

Nonetheless, MCMH argues that the Section 8(a)(3) violation must be reversed because the hospital neither acted with a forbidden motive nor discouraged union membership.

i. Motive

In NLRB v. Great Dane Trailers, Inc., 388 U.S. 26 (1967), the Supreme Court held that a violation of Section 8(a)(3) requires a finding of "improper motive." Id. at 33. "If the employer's conduct is 'inherently destructive' of union members' rights . . . , a violation may be proved without evidence of improper motive if the employer fails to prove that its actions can be justified as 'something different than they appear on their face.'" Southcoast Hosps. Grp., Inc. v. NLRB, 846 F.3d 448, 454 (1st Cir. 2017) (quoting Great Dane, 388 U.S. at 33). "Even if a business justification has been proved, an inference of improper motive may be drawn from the inherently destructive conduct itself . . . ." Id. (quoting Great Dane, 388 U.S. at 33–34). Where the effect of the employer's conduct is instead "comparatively slight," and the employer proves that "the challenged conduct serves 'legitimate and substantial' business

interests," the General Counsel has the burden of proving a discriminatory motive via direct evidence. Id. (quoting Great Dane, 388 U.S. at 34).[4]

MCMH argues that, because the Board did not explicitly find the discharge of Young to be inherently destructive, the discharge must instead have been comparatively slight. Furthermore, MCMH contends that it introduced evidence of legitimate business reasons for the firing, and that the General Counsel was therefore required to submit direct evidence of discriminatory motive, a requirement it failed to meet. This argument is a nonstarter.

Although the Board did not use the phrase "inherently destructive," it did effectively conclude that MCMH's disciplinary actions were just that. The Board held that "Young was discharged for engaging in protected . . . union activity," Me. Coast Reg'l Health Facilities, 369 N.L.R.B. No. 51, slip op. at *1, and we see no basis for concluding that finding was clearly erroneous. Because Young's termination was in direct response to her protected union activity, it was "inherently destructive." See Kaiser Eng'rs

---

[4] The inquiry under Great Dane (whether to infer anti-union motive based on the presence or absence of legitimate business interests for discharge) has the potential to blur with the inquiry under Wright Line (whether the termination was primarily motivated by protected or unprotected conduct) to the point of indistinguishability.

v. NLRB, 538 F.2d 1379, 1386 (9th Cir. 1976) ("Where discriminatory conduct is directly related to protected activity . . . , such conduct is inherently destructive . . . .") (citing Signal Oil & Gas Co. v. NLRB, 390 F.2d 338, 343, 344 (9th Cir. 1968)); see also Kan. City Power & Light Co. v. NLRB, 641 F.2d 553, 559 (8th Cir. 1981) ("[A]ctions creating visible and continuing obstacles to the future exercise of employee rights are inherently destructive." (quotations and citation omitted)); NLRB v. Borden, Inc., Borden Chem. Div., 600 F.2d 313, 321 (1st Cir. 1979) (noting that whether conduct is inherently destructive can turn on "whether the conduct discriminated solely upon the basis of participation in strikes or union activity"); Portland Willamette Co. v. NLRB, 534 F.2d 1331, 1334 (9th Cir. 1976), as amended (June 14, 1976) ("Examples of inherently destructive activity are permanent discharge for participation in union activities . . . ."). Therefore, MCMH's motive-based arguments provide no reason to overturn the Section 8(a)(3) violation.

ii. Actual Discouragement

Next, MCMH claims that the Section 8(a)(3) violation is infirm because there was no direct evidence that Young's firing discouraged membership in a union and because the Board failed to make any findings regarding discouragement. A violation of Section 8(a)(3) "requires specifically that the Board find a discrimination and a resulting discouragement of union

- 24 -

membership." See Great Dane, 388 U.S. at 32 (citing Am. Ship Bldg. Co. v. NLRB, 380 U.S. 300, 311 (1965)). However, direct proof "is not required where encouragement or discouragement can be reasonably inferred from the nature of the discrimination." Radio Officers' Union of Com. Telegraphers Union v. NLRB, 347 U.S. 17, 51 (1954); see also Great Dane, 388 U.S. at 32 (inferring discouragement where employer gave certain benefits to "employees who are distinguishable only by their participation in protected concerted activity"). Moreover, "[d]iscouraging membership in a labor organization 'includes discouraging participation in concerted activities'" related to a union. Great Dane, 388 U.S. at 32 (quoting NLRB v. Erie Resistor Corp., 373 U.S. 221, 233 (1963)).

As discussed, MCMH decided to discharge Young based solely on her protected letter writing activity. It seems obvious to us that firing an employee for participation in protected activities would tend to discourage participation in those activities. Accordingly, discouragement can be easily inferred, and there was no need for direct evidence.

Moreover, given the circumstances, the lack of explicit discussion of discouragement does not invalidate the Board's decision. "The Supreme Court has held, time and again, that a violation of § 8(a)(3) normally turns on an employer's antiunion purpose or motive." 800 River Rd. Operating Co. v. NLRB, 784 F.3d

902, 908 (3d Cir. 2015); see also Radio Officers' Union, 347 U.S. at 44 ("That Congress intended the employer's purpose in discriminating to be controlling is clear."). Unsurprisingly, then, actual discouragement often goes unmentioned in the Board's opinions. See, e.g., Rocky Mountain Eye Ctr., 363 N.L.R.B. No. 34, 2015 WL 6735641, at *1-3 (Nov. 3, 2015) (holding that employer violated Section 8(a)(3), without discussing discouragement, "because the very conduct for which [employee] was terminated was union organizing activity protected by the Act"); Nor-Cal Beverage, 330 N.L.R.B. at 611-12 (concluding that Section 8(a)(3) was violated, without mention of discouragement, where employee was disciplined for protected activity of criticizing fellow employees who expressed interest in breaking picket line).

Here, despite the lack of the word "discouragement," the Board's opinion is replete with statements suggesting a concern for discouragement. First, the ALJ stated that "[i]f employees lost their NLRA right to protest working conditions every time an employer could identify a minor misstatement of the type shown here, it would render that right a nullity in a large segment of instances and would profoundly chill employees from exercising their Section 7 rights at all." Me. Coast Reg'l Health Facilities, 369 N.L.R.B. No. 51, slip op. at *15 (Mar. 30, 2020). Second, the Board's remedy required the Employer to "[a]dvise [its] employees that the original media policy w[ould] not be used to discipline

them for communicating with the news media . . . regarding employees' terms and conditions of employment or union activity." Id. at *4. Similarly, the Board required MCMH to post notices stating that it would not "discharge, discipline, or otherwise discriminate against employees for engaging in protected concerted activities and/or for supporting [the nurses' union,]" and that it would "offer Karen-Jo Young full reinstatement" and "[m]ake [her] whole for any loss of earnings and other benefits." Id. at *5.

The implication is clear: absent a remedy, Young's firing would discourage other employees from engaging in protected activities. See Great Dane, 388 U.S. at 32 (concluding there was "no doubt" the discouragement requirement was met where the employer's conduct "surely may have [had] a discouraging effect on either present or future concerted activity"). We therefore conclude that the Board's determination that MCMH violated Section 8(a)(3) is not spoiled by the lack of an explicit finding of discouragement.

2. Scope of the Remedy

Based on these violations, the Board ordered MCMH to post notices at every EMHS facility where its original media policy was disseminated, including eight medical facilities that appear to be corporate entities separate from MCMH. MCMH now argues that EMHS was not a party to the proceedings, and that the Board

therefore exceeded its authority by compelling MCMH to take actions at those locations.  We agree.

"The Board has 'the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act,' and that discretion is 'subject only to limited judicial review.'"  Visiting Nurse Servs. of W. Mass., Inc. v. NLRB, 177 F.3d 52, 61-62 (1st Cir. 1999) (quoting Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 888-89 (1984)).  However, "the relief which the statute empowers the Board to grant is to be adapted to the situation which calls for redress."  Sure-Tan, 467 U.S. at 900 (quoting NLRB v. MacKay Radio & Tel. Co., 304 U.S. 333, 348 (1938)).  Thus, a remedy ordered by the Board "should stand unless it can be shown that [it] is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act."  Pegasus Broad. of San Juan v. NLRB, 82 F.3d 511, 513 (1st Cir. 1996) (alteration in original) (quoting Va. Elec. & Power Co. v. NLRB, 319 U.S. 533, 540 (1943)).  Here, the relevant policy comes from 29 U.S.C. § 160(b), which provides that the General Counsel must "issue and cause to be served upon [the party] a complaint stating the charges . . . and containing a notice of hearing before the Board."

The General Counsel initiated the proceeding below by serving MCMH with a complaint in which the respondent was named Maine Coast Regional Health Facilities, d/b/a Maine Coast Memorial

Hospital.  Near the end of trial, the General Counsel moved to amend the complaint "to correctly reflect the fact that [EMHS] is certainly the Respondent," stating that the revision was intended to allow the Board to order repudiation notices to be posted at locations other than MCMH.  MCMH initially objected, but, after an off-record discussion, consented only to amending MCMH's name to its current iteration: Maine Coast Regional Health Facilities, d/b/a Maine Coast Memorial Hospital, the sole member of which is Eastern Maine Healthcare Systems.  As the ALJ noted, that change was not what the General Counsel initially sought.

The Board contends that this amendment added EMHS as a party and, in the alternative, that MCMH's consent to the amendment constituted a waiver of its current objection.[5]  The revision, however, simply retained MCMH as the sole respondent, adding only the corporate relationship between MCMH and EMHS.  The amendment did not change the fact that EMHS was never named as the respondent in a complaint, served with a complaint, or given a hearing.[6]

---

[5]  The Board makes no argument that MCMH and EMHS can be treated as one entity under the single employer doctrine.  See generally NLRB v. Hosp. San Rafael, Inc., 42 F.3d 45, 50 (1st Cir. 1994).

[6]  The Board notes that the individual who accepted service on behalf of MCMH and many of those present at the trial were employees of EMHS.  This is inconsequential because those individuals were acting as representatives of MCMH, the sole entity charged in the complaint.  While EMHS was clearly aware of the

Where a parent and subsidiary are properly maintained as separate corporate entities, jurisdiction over the subsidiary does not necessarily generate jurisdiction over the parent. See de Walker v. Pueblo Int'l, Inc., 569 F.2d 1169, 1173 (1st Cir. 1978) (citing Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 335, 336-37 (1925)). Thus, the amendment provides no basis for concluding that EMHS was joined as a party or that MCMH consented to extending the remedy beyond its corporate borders. Allowing the Board to indirectly bind EMHS through an order naming MCMH as its subject would contravene the policy that the Board may exert its authority only over parties that have been afforded notice and hearing. See 29 U.S.C. § 160(b).[7] We conclude that no remedy regarding the non-MCMH locations would be appropriate, so a remand would be pointless. See Wang Theatre, 981 F.3d at 117 (citing NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766-67 n.6 (1969)) (vacating Board's orders without further proceedings where outcome of remand was preordained); Wyman-Gordon Co. v. NLRB, 654 F.2d 134, 147 (1st Cir. 1981) (citing NLRB v. Savin Bus. Machs. Corp., 649 F.2d 89,

_____

proceedings, EMHS was never given notice that it was being charged with violations of labor law.

[7] The Board argues that MCMH lacks standing to raise this argument on behalf of EMHS. As noted, though, the Board's order requires MCMH itself to post notices at the other locations, an unreasonable task given the Board's lack of authority over EMHS. Therefore, MCMH has standing to challenge the scope of the remedy.

- 30 -

93 (1st Cir. 1981)) (enforcing order in part; striking one provision of order without remand).

## IV. Conclusion

We grant the Board's application for enforcement of its order, striking those portions of the order requiring MCMH to post repudiation notices at facilities operated by other corporate entities.

So ordered.